# EXHIBIT 2

Lucas E. Gilmore (250893)
Reed R. Kathrein (139304)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite ~~202~~300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff David Boulware and*
*Additional Plaintiff Christos Givas*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BOULWARE ~~and~~, LAWRENCE LOU, and CHRISTOS GIVAS, individually and on behalf of all others similarly situated,<br><br>                         Plaintiffs,<br><br>     v.<br><br>BIRD GLOBAL, INC., TRAVIS VANDERZANDEN, YIBO LING, JIM MUTRIE, ~~and SCOTT MCNEILL~~SCOTT MCNEILL, CHRIS CARTER, SCOTT GIESELMAN, SAM STOUTNER, PHILIP J. DEUTCH, RAY KUBIS, and PRECIOUS WILLIAMS OWODUNNI,<br><br>                         Defendants. | Lead Case No.<br>2:22-cv-08406-ODW (AGRx)<br><br>**[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................... 5

II.   JURISDICTION AND VENUE ............................................................... 9

III.  PARTIES ................................................................................................ 10

      A.    Plaintiffs ..................................................................................... 10

      B.    Defendants .................................................................................. 10

IV.   SUMMARY OF THE FRAUD ............................................................... 12

      A.    Bird and Its Business .................................................................. 12

      B.    Bird's Revenue Recognition Standards ...................................... 16

      C.    SPACs: A Short Primer .............................................................. 18

      D.    Bird Announces Intent to Go Public Through SPAC
            Merger ........................................................................................ 20

      E.    The Merger Countdown .............................................................. 23

      F.    Bird Repeatedly Meets and Exceeds Guidance as a Result
            of Its Improper Revenue Recognition Practices ........................ 28

      G.    The Façade Begins to Crumble ................................................... 32

      H.    The Truth Emerges ..................................................................... 33

      I.    The Significance of the Restatement and Disclosed
            Internal Control Weaknesses ..................................................... 44

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ............... 47

      A.    May 12, 2021, SEC Filing Announcing Merger .......................... 47

      B.    May 14, 2021, Merger Registration Statement ........................... 50

      C.    June 24, 2021, Research Analyst Day ......................................... 51

- i -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

D.    August 19, 2021, Investor Presentation ............................................53

E.    2Q 2021 Reported Financial Results (August 19, 2021)...................54

    1.    False and Misleading Financial Metrics.................................54

    2.    False and Misleading Identified Drivers for Financial Results....................................................................56

    3.    False and Misleading Statements on August 19, 2021, Q2 2021 Earnings Conference Call...............................57

F.    September 2, 2021, Industry Conference..........................................59

G.    September 15, 2021, Industry Conference.........................................60

H.    October 2021 Prospectus ................................................................62

I.    October 2021 Definitive Proxy Statement.........................................63

    1.    False and Misleading Financial Metrics.................................63

    2.    False and Misleading Statements of GAAP Compliance ..................................................................64

    3.    False and Misleading Identified Drivers for Financial Results....................................................................65

J.    3Q 2021 Reported Financial Results (November 15, 2021) ...........................................................................66

    1.    False and Misleading Financial Metrics in Form 8-K...............................................................................66

    2.    False and Misleading Identified Drivers for Financial Results....................................................................68

    3.    False and Misleading Financial Metrics in Form 10-Q ....................................................................................69

    4.    False and Misleading Statements of GAAP Compliance ..................................................................71

    5.    False and Misleading Internal Control and Sarbanes-Oxley Certifications...................................71

- ii -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6.    False and Misleading Statements on November 15, 2021, Q3 2021 Earnings Conference Call ................................ 72

K.    December 1, 2021, Credit Suisse Technology Conference ............... 74

L.    Q4 and FY 2021 Reported Financial Results (March 15, 2022) ......................................................................................... 75

1.    False and Misleading Financial Metrics in Form 8-K ................................................................................................ 75

2.    False and Misleading Identified Drivers for Financial Results ................................................................................. 77

3.    False and Misleading Financial Metrics in Form 10-K .............................................................................................. 78

4.    False and Misleading Statements of GAAP Compliance ........................................................................................ 80

5.    False and Misleading Internal Control and Sarbanes-Oxley Certifications ............................................................ 81

6.    False and Misleading Statements on March 15, 2022, FY 2021 Earnings Conference Call ............................. 81

M.    1Q 2022 Financial Results (May 16, 2022) ................................ 83

1.    False and Misleading Financial Metrics in 8-K ..................... 83

2.    False and Misleading Identified Drivers for Financial Results ................................................................................. 85

3.    False and Misleading Financial Metrics in Form 10-Q ............................................................................................... 86

4.    False and Misleading Statements of GAAP Compliance ........................................................................................ 87

5.    False and Misleading Internal Control and Sarbanes-Oxley Certifications ............................................................ 88

6.    False and Misleading Statements on May 16, 2022, Q1 2022 Earnings Conference Call ................................... 89

- iii -

N. May 18, 2022, Needham Tech & Media Conference ..........................90

O. 2Q 2022 Financial Results (August 15, 2022)..................................91

    1. False and Misleading Financial Metrics in Form 8-K..............................................................................91

    2. False and Misleading Identified Drivers for Financial Results...........................................................93

    3. False and Misleading Financial Metrics in Form 10-Q...................................................................94

    4. False and Misleading Statements of GAAP Compliance ..................................................................96

    5. False and Misleading Internal Control and Sarbanes-Oxley Certifications.................................96

    6. False and Misleading Statements on August 15, 2022, Q2 2022 Earnings Conference Call................................97

P. September 9, 2022, Industry Conference...........................................99

VI. ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER.............100

VII. LOSS CAUSATION ......................................................................104

A. Corrective Disclosures .........................................................105

B. Materialization of the Risk...................................................106

VIII. NO SAFE HARBOR........................................................................107

IX. PLAINTIFFS' CLASS ACTION ALLEGATIONS..............................108

COUNT I VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS.......................111

COUNT II VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS ...........................113

PRAYER FOR RELIEF ................................................................................115

DEMAND FOR TRIAL BY JURY................................................................115

- iv -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

I.      INTRODUCTION .................................................................................................2

II.     JURISDICTION AND VENUE ..........................................................................7

III.    PARTIES ..............................................................................................................7

        A.      Plaintiffs ...................................................................................................7

        B.      Defendants ...............................................................................................8

        C.      Additional Proxy Defendants .................................................................11

IV.     SUMMARY OF THE FRAUD .........................................................................12

        A.      Bird and Its Business ..............................................................................12

        B.      Bird's Revenue Recognition Standards .................................................16

        C.      Bird's Rider Wallet Subledger ...............................................................18

        D.      SPACs: A Short Primer ..........................................................................18

        E.      Bird Announces Intent to Go Public Through SPAC
                Merger .....................................................................................................21

        F.      The Merger Countdown ..........................................................................23

        G.      Bird Repeatedly Meets and Exceeds Guidance as a Result
                of Its Improper Revenue Recognition Practices ....................................31

        H.      The Façade Begins to Crumble ...............................................................35

        I.      The Truth Emerges ..................................................................................36

        J.      The Significance of the Restatement and Disclosed
                Internal Control Weaknesses ..................................................................48

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS .................52

        A.      May 12, 2021 SEC Filing Announcing Merger ......................................52

        B.      May 12, 2021 CNBC TechCheck: TechCheck's Bosa
                speaks with Bird CEO Travis VanderZanden on going
                public via SPAC – Solicitation Material .................................................56

        C.      May 14, 2021 Merger Registration Statement .........................................58

- v -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

D.    June 24, 2021 Research Analyst Day – Solicitation Material ........................................................................... 59

E.    August 12, 2021 Canaccord Genuity 41st Annual Growth Conference – Solicitation Material ........................ 62

F.    August 19, 2021 Investor Presentation ................................. 63

G.    2Q 2021 Reported Financial Results (August 19, 2021) .................... 64

    1.    False and Misleading Financial Metrics – Solicitation Material ............................................. 64

    2.    False and Misleading Identified Drivers for Financial Results – Solicitation Material ........................ 66

    3.    False and Misleading Statements on August 19, 2021, Q2 2021 Earnings Conference Call ................... 67

H.    September 2, 2021 Industry Conference - Solicitation Material ........................................................................... 68

I.    September 15, 2021 Industry Conference ................................ 70

J.    October 2021 Prospectus .................................................. 72

K.    October 2021 Soliciting Material ......................................... 73

L.    October 2021 Definitive Proxy Statement .............................. 75

    1.    False and Misleading Financial Metrics ................................. 75

    2.    False and Misleading Statements of GAAP Compliance ..................................................... 77

    3.    False and Misleading Identified Drivers for Financial Results ............................................. 78

M.    3Q 2021 Reported Financial Results (November 15, 2021) ..................................................................... 78

    1.    False and Misleading Financial Metrics in Form 8-K ............................................................ 78

- vi -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2. False and Misleading Identified Drivers for Financial Results.................................................80

3. False and Misleading Financial Metrics in Form 10-Q ..........................................................82

4. False and Misleading Statements of GAAP Compliance ........................................................83

5. False and Misleading Internal Control and Sarbanes-Oxley Certifications................................84

6. False and Misleading Statements on November 15, 2021, Q3 2021 Earnings Conference Call...............................85

N. December 1, 2021, Credit Suisse Technology Conference ...............87

O. Q4 and FY 2021 Reported Financial Results (March 15, 2022) ................................................88

1. False and Misleading Financial Metrics in Form 8-K..............................................................88

2. False and Misleading Identified Drivers for Financial Results.................................................90

3. False and Misleading Financial Metrics in Form 10-K ..........................................................91

4. False and Misleading Statements of GAAP Compliance ........................................................93

5. False and Misleading Internal Control and Sarbanes-Oxley Certifications................................93

6. False and Misleading Statements on March 15, 2022, FY 2021 Earnings Conference Call...............................94

P. 1Q 2022 Financial Results (May 16, 2022)......................................96

1. False and Misleading Financial Metrics in 8-K ......................96

2. False and Misleading Identified Drivers for Financial Results.................................................98

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

3.      False and Misleading Financial Metrics in Form 10-Q ................................................................... 99

4.      False and Misleading Statements of GAAP Compliance ......................................................... 100

5.      False and Misleading Internal Control and Sarbanes-Oxley Certifications ................................. 101

6.      False and Misleading Statements on May 16, 2022, Q1 2022 Earnings Conference Call .................. 101

Q.      May 18, 2022 Needham Tech & Media Conference ..................... 103

R.      2Q 2022 Financial Results (August 15, 2022) ........................ 104

1.      False and Misleading Financial Metrics in Form 8-K ................................................................ 104

2.      False and Misleading Identified Drivers for Financial Results ................................................. 107

3.      False and Misleading Financial Metrics in Form 10-Q ................................................................ 108

4.      False and Misleading Statements of GAAP Compliance ......................................................... 111

5.      False and Misleading Internal Control and Sarbanes-Oxley Certifications ................................. 111

6.      False and Misleading Statements on August 15, 2022, Q2 2022 Earnings Conference Call ................ 112

S.      September 9, 2022 Industry Conference ........................... 114

VI.      ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER ............. 115

VII.      LOSS CAUSATION ........................................................... 120

A.      Corrective Disclosures ............................................... 121

B.      Materialization of the Risk ......................................... 122

VIII.   NO SAFE HARBOR ........................................................... 123

- viii -

IX.   PLAINTIFFS' CLASS ACTION ALLEGATIONS ................................... 124

X.   FRAUD CLAIMS .................................................................................. 127

COUNT I VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST DEFENDANTS BIRD, VANDERZANDEN, LING, MUTRIE AND MCNEILL ......................... 127

COUNT II VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST DEFENDANTS VANDERZANDEN, LING, MUTRIE AND MCNEILL ................................................................ 130

XI.   PROXY CLAIMS ................................................................................. 131

COUNT III VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS .............................. 134

COUNT IV VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST DEFENDANTS TRAVIS VANDERZANDEN, YIBO LING, JIM MUTRIE, SCOTT MCNEILL, CHRIS CARTER, SCOTT GIESELMAN, SAM STOUTNER, PHILIP J. DEUTCH, RAY KUBIS, AND PRECIOUS WILLIAMS OWODUNNI ARISING FROM PRIMARY VIOLATIONS OF SECTION 14(A) ...................................... 139

PRAYER FOR RELIEF ................................................................................. 140

DEMAND FOR TRIAL BY JURY ................................................................ 141

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

Lead Plaintiff David Boulware and Additional Plaintiffs Lawrence Lou and Christos Givas (collectively "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Second Amended Consolidated Class Action Complaint ("Complaint") alleging claims pursuant to Sections 10(b), Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Plaintiffs bring these claims on behalf of themselves and (a) all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded common stock of Bird Global, Inc. f/k/a Switchback II Corporation ("Switchback") (collectively, "Bird" or the "Company") between May 12, 2021, and November 18, 2022, both dates inclusive (the "Class Period"). This group is"), as well as (b) all persons and entities other than Defendants who held shares of Switchback common stock as of August 16, 2021 and were eligible to vote on the approval of the business combination between Switchback and Bird Rides, Inc. (the "Merger" or "SPAC Merger") at Switchback's extraordinary general meeting on or about November 2, 2021, based on the Proxy Statement and solicitation materials issued in connection with the Merger. These groups are collectively referred to as the "Class." Excluded from the Class are Defendants, their families, and their affiliates.

Plaintiffs allege the following information based on their personal knowledge. All other allegations in this Complaint are based upon the ongoing investigation undertaken by Plaintiffs' counsel, including their review and analysis of (i) the Company's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) the Company's press releases and reports; (iv) the Company's website and marketing materials; (v) media reports concerning the Company and other facts related to this action; (vi) price and volume data for Company securities; (vii) consultation with experts and investigators; and (viii) additional data concerning the Company and industry as identified herein.

- 1 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## I.    INTRODUCTION

1.    Plaintiffs assert fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. These claims are asserted against Defendants Bird, Travis VanderZanden, Yibo Ling, Jim Mutrie, and Scott McNeill (collectively, "Section 10(b) Defendants")   all of whom made, issued, or disseminated materially false and misleading statements that caused the price of Bird securities to be artificially inflated during the Class Period ("Count I"). Each of these Defendants engaged in an act, practice, course of business, and/or scheme that defrauded or deceived investors ("Count II"). And each of these Defendants (except for Bird) were control persons with respect to such material misstatements and omissions. These claims are predicated on every false and misleading statement identified in Part V, infra, and are brought on behalf of all persons or entities who purchased Bird securities during the Class Period.

1.    Plaintiffs bring this class action for violations of: (i) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired Bird common stock between May 12, 2021 and November 18, 2022, both dates inclusive (the "Class Period"); and (ii) Sections 14(a) and 20(a) of the Exchange Act on behalf of all persons and entities other than Defendants who held shares of Switchback common stock as of August 16, 2021 and were eligible to vote on the approval of the business combination between Switchback and Bird Rides, Inc. at Switchback's extraordinary general meeting on or about November 2, 2021, based on the proxy statement and solicitation materials issued in connection with the Merger (the "Solicitation Materials").

2.    Bird is an electric scooter rental company that went public via merger with a special purpose acquisition company, or "SPAC," a transaction that Defendants announced at the outset of the Class Period on May 12, 2021. In promoting the Merger, and in their public statements after the merger, Defendants

- 2 -

repeatedly touted Bird's "compelling current revenues," which Bird generated from charging ride fees to customers who used Bird's shared scooters. In truth, much of these revenues were illusory. Although Bird's customers had large unpaid balances for rentals already completed, Bird booked the entirety of those balances as revenue without considering at all whether those balances were likely to ever be collectible, in violation of clear and simple accounting procedures. In reality, much of this revenue was uncollectible. By falsely reporting Bird's historical financial performance, Defendants were able to convince Switchback shareholders of Bird's "compelling current revenues" and to approve the business combinationMerger, thereby giving Defendants a substantial stake in a publicly traded company with an enterprise value exceeding $2- billion. Moreover, by continuing to engage in the improper revenue recognition practices after the mMerger through the second quarter of 2022, Defendants were able to deceive investors into believing that Bird was meeting or exceeding its previously published revenue projections.

3.      When Defendants' improper accounting of Bird's financial performance ultimately came to light over a series of disclosures, Bird was forced to (i)- replace its most senior executives,; (ii)- restate over two years of financial statements, and; (iii) cop to material weaknesses in its disclosure controls and processes; and (iv) issue a "going concern" warning stating that Bird's liquid assets may not be sufficient to fund Bird's operating and capital needs. Each of these disclosures caused the price of Bird securities to drop sharply, thereby injuring Plaintiffs and the Class.

4.      Bird calls itself a "micro-mobility" company that is in the business of providing mini scooter and bike rentals. Rather than go public via a traditional Initial Public Offering, Bird agreed to merge with a SPAC, Switchback. Switchback had already gone public in January 2021 as a blank check company, raising money from investors that it promised to use to find a suitable private company to purchase and take public via merger. The decision to go public via SPAC avoided the stringent

- 3 -

scrutiny and the due diligence that underwriting firms perform when companies go public through a traditional IPO. Instead, investors relied on the due diligence of Switchback's management, led by Defendants Mutrie and McNeill, to assure the accuracy of Bird's financial statements and other representations. Mutrie and McNeill, however, had a conflict of interest with Switchback shareholders. Switchback's sponsor, NGP Switchback II, an entity run by Mutrie and McNeill, received a 20% interest in Switchback for a mere $25,000. This entitled them to a large ownership percentage of Bird if they could complete an acquisition, but if Switchback could not successfully merge with Bird or another target company, McNeill and Mutrie would lose their 20% interest in Switchback and be required to return the SPAC's money to its outside investors. Nonetheless, Switchback claimed to investors that it conducted extensive due diligence into Bird, including, crucially, its "current revenues" and accounting practices.

5. Bird's primary business is to acquire electric mini scooters, which it makes available on the streets of major cities for on-demand rental, charged by the minute. To use Bird's service, customers must download the Bird app, set up an account, and pre-pay a minimum amount to be placed on an electronic "wallet." As a customer uses a Bird scooter, Bird deducts money from the wallet to cover the cost of the rental. While a customer must have a positive wallet balance to initiate a rental, a customer can

5.6. Given the nature of Bird's business model, Defendants were acutely aware of the possibility of Bird being unable to collect unpaid balances. The rider wallet provided the sole method for riders to pay for trips. Defendants designed the app with collectability in mind, as riders had to pay upfront to activate the scooter. But Bird nevertheless permitted riders to pay with credit, debit, or pre-paid gift cards. And while a customer must have a positive wallet balance to initiate a rental, Defendants designed their rental process allowing a customer to incur a negative

- 4 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147.11/2321628 V1Compare Result 7 12/18/2023

wallet balance by keeping an existing rental outstanding for longer than would be covered by the customer's balancewallet balance. Thus, Defendants were acutely aware of the risk that certain of its riders' cards on file would decline charges.

7.    Throughout the Class Period, Bird represented that it complied with Generally Accepted Accounting Principles, including with respect to recognizing shared revenues. Despite the fact that the relevant accounting standard, ASC 606, required that before Bird recognizes revenue from customer accounts with negative balances, it make a determination as to whether the balance is likely to be collectible, Bird booked revenue without making that determination. As a result of Bird's failure to perform that basic analysis, Bird overstated its revenue by $14.0 million and $4.5 million for the years ended December 31, 2021 and 2020, respectively. In addition, by continuing to engage in the improper revenue recognition practices after the merger, through the second quarter of 2022, Defendants were able to trickmislead investors into believing that Bird was meeting or even exceeding its quarterly revenue guidance. Investors remained unaware that anything was wrong at Bird until September 21, 20212, when Bird abruptly announced that it was terminating its CEO and CFO effective immediately, replacing its CFO with a total outsider. Then, less than two months after the new CFO came in, Bird came clean, disclosing that Bird had overstated its revenue for more than two years by recognizing unpaid customer rides and thus the company's financial reports for this period "should no longer be relied upon," restating its true financial performance reflecting materially less revenue than previously reported, and admitting to material weaknesses in the Company's internal disclosure controls and processes over financial reporting. These announcements caused Bird's stock to substantially depreciate in value. Given

8.    Bird's revenue inflation throughout the Class Period was readily apparent from internal business records Bird's management reviewed. In disclosing the accounting error, new Bird CFO Ben Lu admitted that Bird uncovered the error

- 5 -

by evaluating the source business record the Company uses to prepare its financial statements: Bird's rider wallet subledger, which showed that the Company was not receiving payments for balances they booked as revenue.

6.9.    Given the accessibility of conflicting internal financial business records, the obvious nature of Bird's accounting irregularities, the abrupt terminations of Bird's senior executives, the due diligence conducted in connection with Bird's acquisition by Switchback, and the speed with which Bird's new executive team was able to identify and correct Defendants' falsehoods, it is apparent that Bird's misstatements concerning its revenues (as set forth below and herein) were made knowingly or at a minimum with reckless disregard for their truth.

**Sharing Revenue**          Values in thousands (except percentages)

| Rep. Period | Original | Restated | Difference | % Diff. |
|---|---|---|---|---|
| FY 2020 | 79,941 | 75,445 | 4,496 | 5.6% |
| Q1 2021 | 21,649 | 20,226 | 1,423 | 6.6% |
| Q2 2021 | 56,638 | 52,248 | 4,390 | 7.8% |
| Q3 2021 | 64,027 | 59,729 | 4,298 | 6.7% |
| Q4 2021 | 45,013 | 40,527 | 4,486 | 10.0% |
| FY 2021 | 187,327 | 172,729 | 14,598 | 7.8% |
| Q1 2022 | 33,577 | 30,974 | 2,603 | 7.8% |
| Q2 2022 | 72,395 | 62,498 | 9,897 | 13.7% |

**Total Revenue**          Values in thousands (except percentages)

| Rep. Period | Original | Restated | Difference | % Diff. |
|---|---|---|---|---|
| FY 2020 | 94,601 | 90,105 | 4,496 | 4.8% |
| Q1 2021 | 25,670 | 24,247 | 1,423 | 5.5% |
| Q2 2021 | 60,044 | 55,654 | 4,390 | 7.3% |
| Q3 2021 | 65,406 | 61,108 | 4,298 | 6.6% |
| Q4 2021 | 54,022 | 49,536 | 4,486 | 8.3% |
| FY 2021 | 205,142 | 190,544 | 14,598 | 7.1% |
| Q1 2022 | 37,978 | 35,375 | 2,603 | 6.9% |
| Q2 2022 | 76,662 | 66,765 | 9,897 | 12.9% |

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

## II. JURISDICTION AND VENUE

7.10. The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 and certain rules promulgated by the U.S. Securities and Exchange Commission. Specifically, this Complaint asserts claims under: (1) Section Sections 10(b) of the Exchange Act ("§ 10(b)")), 14(a), and Rule20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), and SEC Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, *see* 15 U.S.C. § 78j(b) and , 17 C.F.R. § §§ 240.10b-5; and (3) Section 20(a) of the Exchange Act ("§ 20(a)"), *see* 15 and 240.14a-9, and 28 U.S.C. § 78t(a). 1331.

8.11. The Court has jurisdiction over this action's subject matter under Section 27 of the Exchange Act, *see* 15 U.S.C. § 78aa (exclusive jurisdiction over Exchange Act violations) and 28 U.S.C. § 1331 (federal question jurisdiction).

9.12. Venue is proper in this District under Section 27 of the Exchange Act, *see* 15 U.S.C. § 78v and 28 U.S.C. § 1391(b) & (d). At all relevant times, Bird conducted business and maintained its principal executive office at 406 Broadway, Suite 369, Santa Monica, California 90401, in this District. Additionally, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

10.13. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

**A.     Plaintiffs**

11.14. Lead Plaintiff David Boulware, as set forth in his Certification (ECF No. 24-1), purchased Bird common stock at artificially inflated prices during the Class

- 7 -

011147 11/2321628 V1Compare Result 7 12/18/2023

Period and was damaged upon the revelationsuffered damages due to Defendants' violations of the federal securities laws alleged corrective disclosureherein.

15. Plaintiff Lawrence Lou, as set forth in his Certification (ECF No. 16-2), purchased Bird securities at artificially inflated pricescommon stock during the Class Period and was damaged upon the revelationsuffered damages due to Defendants' violations of the federal securities laws alleged corrective disclosureherein.

12.16. Plaintiff Christos Givas, as set forth in his Certification attached hereto, purchased Bird securities during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein. Plaintiff Givas also held Switchback common stock on the close of business of the record date August 16, 2021 ("Record Date") for the Merger and was entitled to vote on the Merger at the November 2, 2021 special meeting of shareholders.

**B.     Defendants**

13.17. Defendant Bird Global, Inc. is a micro-mobility company based in Miami, Florida. It was founded as Bird Rides, Inc., on September 1, 2017, in Santa Monica, California, by Defendant Travis VanderZanden, a former executive at Uber and Lyft. Bird is incorporated under the laws of Delaware and is headquartered at 392 NE 191st Street, #20388, Miami, Florida 33179. During the Class Period, Bird securities awere traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BRDS."

14.18. Prior to the Merger, Bird was named Switchback II Corporation ("Switchback")"), and its ordinary shares, public warrants and units were traded publicly on the NYSE under the ticker symbols "SWBK," "SWBK WS," and "SWBK.U," respectively. Switchback was a SPAC created by Defendants Jim Mutrie and Scott McNeill, both former executives at Dallas, Texas-based oil and gas driller RSP Permian, to effect a business combination with a business in the

- 8 -

energy transition or sustainability industries. Switchback and Bird Rides, Inc. merged to become Bird Global.

15.   Defendant Travis VanderZanden ("VanderZanden") was the Chief Executive Officer ("CEO") of Bird from the beginning of the Class Period until September 21, 2022.

16.   Defendant Yibo Ling ("Ling") has been the Chief Financial Officer ("CFO") of Bird from the beginning of the Class Period until September 21, 2022.

19.   Prior to the Merger, Defendant Travis VanderZanden ("VanderZanden") was the founder and Chief Executive Officer of pre-Merger Bird, and the Chief Executive Officer and a director of Bird Holdings since its formation. After the Merger, VanderZanden served as the President, Chief Executive Officer, and Director of post-Merger Bird until September 21, 2022. Throughout the Class Period, VanderZanden publicly touted his intimate knowledge of the Company's business strategy, shared scooter operations, and financial performance. Moreover, VanderZanden emphasized his extensive knowledge and experience in the ride sharing business, including with respect to generating revenue. Prior to founding Bird, Mr. VanderZanden held several leadership positions in the ridesharing and transportation industries, serving as Chief Operating Officer of Lyft and as a Vice President at Uber. Mr. VanderZanden also founded the on-demand car washing company, Cherry, which was acquired by Lyft, and was Chief Revenue Officer and the first hire at Yammer, a business software company acquired by Microsoft.

20.   Prior to the Merger, Defendant Yibo Ling ("Ling") was the Chief Financial Officer of pre-Merger Bird, and the Chief Financial Officer of Bird Holdings since its formation. After the Merger, Ling was the Chief Financial Officer ("CFO") of post-Merger Bird until September 21, 2022. As CFO, Mr. Ling purported to oversee the Company's accounting, tax, treasury, financial planning, and analysis functions. Throughout the Class Period, Ling publicly touted his intimate knowledge

- 9 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of the Company's financial performance. Moreover, Ling emphasized his extensive knowledge and experience of accounting and financial reporting in the ride share industry. Prior to joining Bird in 2018, Mr. Ling spent four years in the ride-sharing industry as Uber's Director of Corporate Development, managing corporate strategy, mergers and acquisitions, and Uber's global expansion to China.

21. Defendant Jim Mutrie ("Mutrie") was one of the co-founders of Switchback and acted as Switchback's Co-Chief Executive Officer from December 2022 up until completion of the merger with Bird Rides, Inc. Mr. Mutrie was also a member of Switchback's Board of Directors from October 2020 up until completion of the merger with Bird Rides, Inc. Since the completion of the merger in November 2021, Defendant Mutrie has served as a Director of Bird's Board of Directors.

22. Defendant Scott McNeill ("McNeill") was one of the co-founders of Switchback and acted as Switchback's Co-Chief Executive Officer from December 2022 up until completion of the merger with Bird Rides, Inc. Mr. McNeill was also a member of Switchback's Board of Directors from October 2020 up until completion of the merger with Bird Rides, Inc.

23. Defendants VanderZanden, Ling, Mutrie, and McNeill are sometimes referred to herein as the "Individual Defendants."

24. Each of the Individual Defendants:

(a)     directly participated in the management of Bird;

(b)     was directly involved in the day-to-day operations of Bird at the highest levels;

(c)     was privy to confidential proprietary information concerning Bird and its business and operations;

- 10 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of Bird's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Bird; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

21.25. Bird is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

22.26. The scienter of the Individual Defendants and other employees and agents of Bird is similarly imputed to Bird under *respondeat superior* and agency principles.

23.    Bird and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**C.    Additional Proxy Defendants**

27.    Defendant Chris Carter was a Director of Switchback at the time of the Merger.

28.    Defendant Scott Gieselman was a Director of Switchback at the time of the Merger.

29.    Defendant Sam Stoutner was a Director of Switchback at the time of the Merger.

30.    Defendant Philip J. Deutsch was a Director of Switchback at the time of the Merger.

- 11 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

31.    Defendant Ray Kubis was a Director of Switchback at the time of the Merger.

32.    Defendant Precious Williams Owodunni was a Director of Switchback at the time of the Merger.

33.    The Proxy was issued "By Order of the Board of Directors" and the Board "unanimously recommend[ed] that [shareholders] vote or give instruction to vote 'FOR'" the proposals in the Proxy, including the Merger. Because of the Individual Defendants' and Additional Proxy Defendants' management positions with respect to Switchback, the Sponsor, and/or Bird, and relevant stock ownership, they each had ultimate authority over the information contained in the Proxy.

## IV.    SUMMARY OF THE FRAUD

### A.    Bird and Its Business

34. Bird is a micro-mobility company. The Company provides a fleet of shared electric scooters designed for short-term rental in over 250 cities across the globe.

35. At all relevant times, Bird had two categories of offerings, Sharing Sales and Product Sales.

36. Bird's Sharing business, Bird's core offering since 2017, provides riders with on-demand access to Bird vehicles through its Bird App. Users must download the Bird app to rent Bird e-scooters. When users open the app, they see a map of all e-scooters available nearby.

- 12 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS



27.37. Before starting a trip, users supply payment information and load money into a virtual "wallet."



- 13 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

28.38. The user then scans the QR code on the e-scooter, beginning the trip.



29.39. To end the trip, the user must take a photo of the parked e-scooter.



- 14 -



30.40. The price of the trip is immediately withdrawn from the user's wallet.



31.41. Bird generates Sharing Revenue in the form of ride fees from each trip taken. For a single ride, riders pay a standard unlock fee in addition to a per-minute price for each minute the vehicle is unlocked.

- 15 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

32.42.Historically, almost all of Bird's revenue was generated from its Sharing business.[1] For example, for the first half of 2021 and full year 2020, 91% and 85%, respectively, of Bird's total revenue was generated from the Sharing business.

43.    Defendants designed Bird's business strategy with collectability of rider fees in mind. To access Bird's scooters, riders must first download the Company's app and load money onto a virtual "wallet" through a credit, debit, or pre-paid gift card. At ride's end, Bird calculates the rider's fee based on the trip's duration and then withdraws that amount from the wallet.

33.44.Unbeknownst to investors, there was a major flaw in Bird's Sharing Revenue collection system:Bird allows its customers to incur negative wallet balances. That is, if the price of a ride exceeded the amount of money in a rider's pre-loaded wallet, then Bird could not readily collect the entire ride fee. Instead, riders were permitted to carry a negative balance. This flawrisk, and Bird's failure to account for it in its publicly filed financials, was the root cause of the issues giving rise to this action.

**B.     Bird's Revenue Recognition Standards**

34.45.ASC 840, Leases, was the former accounting standard issued by the Financial Accounting Standards Board (FASB) that governed the proper accounting treatment for leases.

35.46.ASC 840 is considered a part of Generally Accepted Accounting Principles (GAAP) in the United States. GAAP is a set of accounting principles, standards, and procedures that companies are required to follow when preparing and presenting their financial statements. It provides a standardized framework for financial reporting to ensure consistency, comparability, and transparency in financial statements.

---

[1] Bird Global also generated a small fraction of its revenue from its Sales business. This revenue primarily consisted of sales of its vehicles to retail customers and is not the subject of this Complaint.

- 16 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

36.47.ASC 840 provided guidelines for lessors to recognize and measure lease transactions in their financial statements. It was superseded by ASC 842, which came into effect for public companies for fiscal years beginning after December 15, 2018, and for private companies one year later.

37.48.Bird repeatedly stated throughout the Class Period that it accounted for its Sharing Revenue pursuant to ASC 840 and was "in the process of evaluating [the] impact" of ASC 842.

38.49.Collectability of revenue is central to ASC 840 and lessors must account for collectability based on the likelihood of collecting payments.[2] If collectability is not reasonably assured, the lessor should defer recognition of the rental income until cash is received. In layperson terms: "don't count your chickens before they hatch."

39.50.The determination of collectability, which is set forth in ASC 606, involves assessing the creditworthiness and financial stability of the lessee. If there are doubts about the lessee's ability to make payment, the lessor should use the "cash basis" method of accounting. Under the "cash basis" method of accounting, the lessor recognizes income only when cash is received from the lessee.

---

[2] *See, e.g.*, *Accounting Standards Codification 840, Leases*, EY (Rev. May 2022), § 3.3.1 ("Collectibility") ("As with any other receivable, estimates must be made about the collectibility of amounts receivable from leases based on either experience with groups of similar leases or receivables or the circumstances surrounding a particular lease."), available at https://www.ey.com/en_us/assurance/accountinglink/financial-reporting-developments---lease-accounting---accounting0 https://www.ey.com/en_us/assurance/accountinglink/financial-reporting-developments---lease-accounting---accounting0 (last accessed Aug. 11, 2023); *Accounting Standards Codification 606, Revenue from Contracts with Customers*, EY, § 3.1.5 ("Collectibility") ("An entity should assess a customer's ability to pay based on the customer's financial capacity and its intention to pay considering all relevant facts and circumstances, including past experiences with that customer or customer class."), available at https://www.ey.com/en_us/assurance/accountinglink/financial-reporting-developments---revenue-from-contracts-with-c (last accessed Aug. 11, 2023).

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

40.51. Despite repeatedly stating that it accounted for its Sharing Revenue pursuant to ASC 840, Bird recognized all revenue upon ride completion.

41.52. This revenue recognition standard is inconsistent with GAAP because it fails to account for collectability. Bird never assessed the likelihood that its riders, which could include anyone with a phone, a credit card, and a willingness to ride an electric scooter, would fail to pay for their transactions. As a result, Bird recognized all Sharing Revenue at the completion of the scooter ride, *even when it had not collected the revenue and was unlikely to ever do so*.

## C.     Bird's Rider Wallet Subledger

53.     Throughout the Class Period, Bird reported its financial performance by publishing, among other things, the Company's Condensed Consolidated Financial Statements, including its Balance Sheets and Statements of Operations. As confirmed by Bird's new CFO Ben Lu, during the Class Period, Bird maintained an internal Rider Wallet subledger that served as a source for Bird's presentation of its financial statements.[3] According to Lu, the Rider Wallet subledger reflects, among other things, the "fail payments occurring after the completion of a ride."

## C.D.   SPACs: A Short Primer

42.54. Beginning in November 2020, media outlets began reporting that Bird had retained an investment bank to strike a deal with a SPAC to take Bird public. By way of background, a SPAC (also known as a blank check company) is a publicly traded company established with the purpose of raising capital to find an appropriate acquisition target, and ultimately use the funds it raises through its IPO to acquire another company. As part of the SPAC process, a SPAC first lists itself on a stock

---

[3] A ledger is "the focal (accumulation) point for all of the transactional details and is the source of the summarized data that go directly into the financial statements." *Introduction*, 9 Norton Bankr. L. & Prac. 3d § 180:8; *see also*, "Hot Topics in Valuation," 030117 ABI-CLE 489 (the general ledger is the source of information for preparing financial statements).

- 18 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

exchange and raises proceeds through an initial public offering. The funds raised in the SPAC's initial public offering ("IPO") are placed into a trust account. The SPAC then searches for an appropriate acquisition target. If the SPAC cannot find an appropriate target within a specified period of time, it returns the money it raised to its public investors and dissolves.

43.55. If the SPAC's sponsors identify a suitable partner, they enter into an agreement whereby the private company becomes publicly traded using the SPAC's corporate structure. The SPAC formally acquires the private company, and in return, issues SPAC shares to the private company's shareholders. The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings.

44.56. This process essentially constitutes a reverse merger. It enables private companies to enjoy the advantages of an IPO, such as publicly traded shares and substantial funding, without having to comply with the regulatory and disclosure requirements typically associated with traditional IPOs. The SPAC sponsors, on the other hand, usually stand to make millions no matter how the post-merger company works out.

45.57. Sponsors typically receive shares in the SPAC at a steeply discounted price compared to the general public, but do not receive compensation during the deal-seeking period. However, if the de-SPAC transaction is successfully completed, sponsors are generously rewarded, receiving a large share of the acquired company's equity based on their ownership of a large percentage of the SPAC.

46.58. But the SPAC's structure creates a sense of urgency for its sponsors to complete a transaction. Should a SPAC fail to finalize a de-SPAC transaction before its designated deadline (usually, and in this instance, within two years after the IPO), the trust holding the funds is liquidated and the resulting proceeds are returned to the public investors in the SPAC, leaving the sponsors with worthless shares.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1 Compare Result 7 12/18/2023

47.59. In the event that the SPAC fails to complete a de-SPAC transaction, the sponsors do not receive compensation for their efforts.

48.60. If the sponsors propose a de-SPAC transaction before the deadline, SPAC investors are provided with certain information about the proposed transaction and the target company that is intended to be acquired. Shareholders then vote on whether to approve the deal. If shareholders choose to reject the acquisition, they can exercise their right to redeem their pro rata investment interest in the SPAC (redemption rights).

49.61. Although SPACs have been in existence for decades, their popularity has significantly surged in recent years. According to the SEC, during the first three months of 2021, nearly 300 SPACs conducted IPOs, collectively raising nearly $83 billion. Bird and Switchback announced their merger in May 2021, during the following quarter.

50.62. In response to the significant increase in SPAC activity and the growing number of reports about fraud and conflicts of interest associated with SPACs, the SEC's Investor as Purchaser and Investor as Owner Subcommittees of the SEC Investor Advisory Committee issued draft recommendations to the SEC on August 26, 2021 (referred to as the "SEC Draft Report"). At the time that the SEC Draft Report was issued, Bird and Switchback were actively cultivating support for the upcoming merger vote.

51.63. The SEC Draft Report highlighted various concerns. Among others, the report pointed out that "SPACs by their very nature are rife with conflicts of interest which must be disclosed to potential investors" and "[e]ven where those conflicts are disclosed, their import may not be clear to an unsophisticated investor." This is because "the purpose of the SPAC is to invest in a yet-to-be-determined company, [so] the investors must place a great deal of trust in the SPAC sponsor to find the best candidate for merger."

- 20 -

52.64. The SEC Draft Report also noted how SPACs may disadvantage retail investors: "We think the SEC should explore the data to determine whether this puts retail investors at a disadvantage and whether the SEC should make any recommendations to Congress regarding necessary statutory changes."

53.65. In sum, the report concluded that it "was clear from the discussion that, while the sponsors and redeeming shareholders (often more sophisticated than the remaining shareholders) do very well in the SPAC, the risks and costs of the SPAC are not well understood by the average retail investor."

## D.E.   Bird Announces Intent to Go Public Through SPAC Merger

54.66. The Class Period begins on May 12, 2021, when Bird announced the signing of a definitive business combination agreement with publicly traded special purpose acquisition company Switchback that would make Bird a public company, pending Switchback shareholder approval and satisfaction of other customary closing conditions. The transaction implied a pro forma enterprise valuation for Bird of $2.3 billion. The business combination agreement contemplated that existing Bird shareholders would roll-over and retain 100% of their existing equity, owning approximately 82% of the combined company's pro forma equity. The transaction would also enable the combined entity to retain net proceeds of up to $428 million of cash following the closing to fund operations and growth initiatives and for general corporate purposes.

55.67. The announcement of the business combination, filed on Form 8-K with the SEC, included the Audited Consolidated Financial Statements of Bird Rides, Inc., and claimed that Bird had generated $79.941 million in Sharing Revenues in FY 2020 and $140.448 million in FY 2019. The financial statements included other metrics, including gross margin, net loss, and net loss per share, that derive from Bird's Sharing Revenue figures.

- 21 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.68. The Form 8-K announcement of the business combination also included a press release wherein Defendants Mutrie and McNeill emphasized Bird's "compelling current revenues" as one of the reasons Switchback decided to acquire Bird:

> As a category creator for the shared micromobility space, Bird has capitalized on its first-mover advantage to address the significant market opportunity while also providing an efficient and eco-friendly transportation alternative. With its market leadership position, experienced and innovative leadership team, *compelling current revenues* and business model, along with identified levers for growth, Bird satisfies all the investment criteria we were seeking and we are pleased to announce the definitive agreement for this combination.

57.69. Later, on May 12, 2021, Switchback and Bird hosted an investor call with Defendants Mutrie and VanderZanden acting as the corporate participants. Defendants Mutrie again reiterated Bird's "compelling current revenues":

> Bird has all the attributes we look for in a company to partner with a large and growing addressable market opportunity, a market leader with a strong brand and reputation, an experienced management team, *compelling current revenues* and a returns-oriented business model, as well as clearly defined catalysts for growth.

58.70. On that call, Defendant VanderZanden spoke about Bird's revenues, claiming that Bird was "well on pace to hit $400 million of revenue in 2022."

59.71. Defendants also released an investor presentation and Bird's audited financial statement on that same date. The presentation repeatedly makes claims about Bird's revenue, growth, profitability, and adjusted EBITDA. For instance, the presentation claims 2019 total revenue of $151 million and 2020 total revenue of $95 million. The audited financial statement provides the same (incorrect) figures.

- 22 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

60.72. In the presentation, Defendants identified the key drivers of Bird's revenue:



61.73. Also on May- 12, 2021, Switchback filed with the SEC an internal Bird presentation. That presentation described Defendants Mutrie and McNeill as "hav[ing] a demonstrated ability to drive a successful business combination, most recently through the successful listing of ChargePoint via Switchback's last SPAC," and stated that, "[i]t's more important than ever to … [b]eat and raise our targets[.]"

### E.F.  The Merger Countdown

62.74. Over the following months, Bird and Switchback attempted to convince shareholders to approve the merger.

63.75. To convince shareholders, the companies, along with the Individual Defendants, filed various statements and prospectuses with the SEC and fanned out to attend industry conferences across the country.

64.76. In statements in these filings and at these conferences, Defendants repeatedly pointed to Bird's revenues, unit economics, gross margin, and adjusted

- 23 -

EBITDA (earnings before interest, taxes, depreciation, and amortization), as well as its projections based on historical figures, as "key elements" in support of the merger. But Bird repeatedly overstated its revenues and therefore painted an unrealistically favorable view of "key elements."

65.77. For instance, Bird consistently maintained throughout the Class Period that it had a total 2020 Sharing Revenue of $79.941 million and total 2019 Sharing Revenue of $140.448 million. During analyst calls and other conferences with investors, Defendants would tout these revenue figures and draw investors' attention to (claimed) guidance beats. Defendants would then attribute their historical revenue growth and forecast beats to various aspects of Bird's business model and other macroeconomic circumstances, never mentioning any assessment of whether Bird had collected, or would ever collect, the claimed revenue. Switchback's repeated claims to have conducted extensive due diligence before agreeing to pursue a merger with Bird gave all of these claims a veneer of legitimacy.

66.78. In an investor presentation delivered to research analysts on June 24, 2021, Defendant Ling presented a variety of financial metrics suggesting that Bird had had strong historical growth. Bird's 2019 total revenue was $140.5 million, and while revenue plunged in Q2 2020 because of pandemic-related restrictions, Defendant Ling presented quarterly figures purportedly showing a dramatic rebound in the second half of 2020, leading to 2020 total revenue of $79.9 million and record first quarter revenue in Q1 2021.

67.79. In an August 19, 2021, press release announcing Bird's 2Q 2021 financials (the final quarterly report after the merger was announced and before the merger vote was held), Defendant Ling claimed that Bird had "well exceeded our expectations, including significant outperformance in gross margin, Ride Profit, and Adjusted EBITDA during the second quarter and first half of the year." Similarly, the press release quoted Defendant VanderZanden as saying, "Our second quarter

- 24 -

011147 11/2321628 V1 Compare Result 7 12/18/2023

financial results reflect significant outperformance compared to our expectations as we continued to deliver industry-leading results driven by strong execution, tailwinds from the easing of COVID-19 restrictions in major markets, and favorable regulatory environments across cities which continue to support increased demand for eco-friendly and naturally socially distanced transportation."

68.80. On the earnings conference call later that day, Defendant VanderZanden repeated the same themes, boasting, "We delivered a record performance in the second quarter and first half of this year, highlighted by second quarter Revenue surpassing expectations by 36%," with the drivers of that performance including "strong execution against our strategic objectives." Similarly, Defendant Ling claimed "significant revenue improvement, with second quarter revenue up 477% compared to the same period last year and 43% compared to Q2 2019," and attributing that growth to "increases in ride volume and trip duration[.]"

69.81. Several weeks later, at a September 2, 2021, fireside chat sponsored by the Palm Beach Hedge Fund Association, Defendant VanderZanden repeated this false and misleading information, claiming that "revenue was 60 million in Q2 of this year, so year over year that was 477% increase," attributable to "macro tailwind, strong execution." He also pointed to supposed overperformance relative to the SPAC funders' forecast, which was "something we're, you know, super proud of, I know." Removing any remaining doubt of the importance of beating forecasts, VanderZanden directly stated that, "It's really important to us to try to outperform the forecast as much as possible and so that's the thing we're most proud of."

70.82. Two weeks later, at the Citi Global Technology Virtual Conference on September 15, 2021, Defendant VanderZanden described financial metrics seeming to suggest rapid growth, pointing to "massive improvements quarter-over-quarter on the ride profit side," with ride profit improving from negative 54% ride profit margin pre-COVID to positive 35% during Q1 2021 and 49% during Q2 2021. At that

- 25 -

conference, VanderZanden again (falsely) claimed $60 million in Q2 2021 revenue, 477% growth compared to the prior year, that he was "most excited" about "really overperform[ing] on our first quarter relative to the expectations[,]" and that the growth was attributable to "hard work" and a "great naturally social distanced way to get around the city."

83. In its October 7, 2021, prospectus and definitive proxy statement issued in support of a favorable shareholder vote, the Proxy stated that the Switchback Board recommended that shareholders vote to approve the Merger at the special meeting of shareholders scheduled for November 2, 2021. The Proxy stated: "The Switchback Board believes that each of the Business Combination Proposals, the Organizational Documents Proposal, the Advisory Organizational Documents Proposals, the NYSE Proposal, the 2021 Plan Proposal, the ESPP Proposal, and the Adjournment Proposal is in the best interests of Switchback and Switchback's shareholders and recommends that its shareholders vote 'FOR' each Proposal being submitted to a vote of the shareholders at the extraordinary general meeting."

84. The Proxy added:

> The Switchback Board considered a wide variety of factors in connection with its evaluation of the Business Combination, including its review of the results of the due diligence conducted by Switchback's management and Switchback's advisors. As a result, the Switchback Board concluded that a transaction with Bird would present the most attractive opportunity to maximize value for Switchback's shareholders. Please see the subsection entitled "The Business Combination - The Switchback Board's Reasons for the Approval of the Business Combination."

85. In the section entitled "The Switchback Board's Reasons for the Approval of the Business Combination," the Proxy stated that before reaching its decision, the Switchback Board reviewed the results of the due diligence conducted by Switchback's management and Switchback's advisors and consultants, which

- 26 -

included, among other things, "financial and valuation analysis of Bird and the Business Combination; and review of the financial statements of Bird."

86.   The Proxy explained the Board's rationale for recommending the Merger, noting among other reasons:

> *Business Model and Unit Economics.* The Switchback Board considered Bird's flexible business model, demonstrated by the evolution to a Fleet Manager operating model during the COVID-19 pandemic that facilitated expansion to smaller cities, reduced infrastructure costs and drove improved and year round-positive unit economics.
>
> *Financial Condition.* The Switchback Board also considered factors such as Bird's outlook, pipeline and financial plan, as well as valuations and trading of publicly traded companies and valuations of precedent combinations and combination targets in similar and adjacent sectors.
>
> *Operating History and Management Team.* The Switchback Board considered the fact that Bird has a three-year operating history, which has enabled it to develop a global footprint covering over 300 cities worldwide and build a strong management team with demonstrated success that is expected to remain with the post-combination company and continue to seek to execute Bird's strategy.

71.87. Bird again claimed FY 2020 Sharing Revenue of $79.941 million and $140.448 million in FY 2019 Sharing Revenue. Meanwhile, in that same prospectus, Switchback claimed to have reviewed "the results of the due diligence conducted by Switchback's management and Switchback's advisors," and that, "[a]s a result, the Switchback Board concluded that a transaction with Bird would present the most attractive opportunity to maximize value for Switchback's shareholders." Switchback specifically stated that it had reviewed "financial and valuation analysis of Bird and the Business Combination; and review of the financial statements of Bird."

- 27 -

72.88. Switchback explained its diligence process in painstaking detail across six pages, describing numerous reviews, reports, and meetings, creating an image of an acquirer that had done all its homework before recommending the deal.

73.89. The Proxy Statement detailed the extensive due diligence Switchback, including Mutrie and McNeill personally, undertook prior to the acquisition. It includes the following:

(a)    Commencing in late February and ending on May 11, 2021, management of Switchback and Bird held periodic conference calls to discuss various aspects of Bird's business and the status of certain workstreams related to the proposed transaction.

(b)    On March 4, 2021, in connection with ongoing discussions regarding the Business Combination, Switchback and representatives of the Sponsor, Goldman Sachs, and Credit Suisse discussed Bird's financial and operating projections and model.

(c)    Throughout March and April 2021, Switchback continued to conduct due diligence regarding Bird. On March 9, 2021, Messrs. Mutrie and McNeill participated in a meeting with representatives of the Sponsor, Goldman Sachs, KPMG, Chord, and Vinson & Elkins to discuss the process and the status of due diligence.

(d)    On March 10, 2021, Messrs. Mutrie and McNeill participated in a meeting with representatives of the Sponsor, Goldman Sachs, Sullivan & Cromwell LLP, counsel to Goldman Sachs and Credit Suisse as co-lead placement agents, Vinson & Elkins, and Bird to discuss Bird's business strategy.

(e)    On March 16, 2021, Messrs. Mutrie and McNeill convened a meeting of the Switchback Board to discuss the progress of the Business Combination.

- 28 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(f)    On March— 18, 2021, Messrs. Mutrie and McNeill and representatives of the Sponsor and Goldman Sachs discussed changes to Bird's financial and operating projections.

(g)    From March– 18, 2021, through April– 30, 2021, representatives of Switchback, Bird, and their respective advisors participated in numerous due diligence calls and fielded numerous email requests regarding Bird's business, financial operations, tax matters, employee benefits matters, intellectual property and privacy matters, as well as compliance.

(h)    On March– 31, 2021, Switchback convened a regularly scheduled meeting of the Switchback Board. At the meeting, Messrs. Mutrie and McNeill, with Goldman Sachs in attendance, reviewed with the Switchback Board updates on their discussions with representatives of Bird, including the revised enterprise value for Bird, and conveyed their belief that a Business Combination with Bird remained the most attractive acquisition opportunity Switchback had evaluated.

74.90. The Proxy Statement also described Defendants Mutrie and McNeill's expertise and qualifications. Both had been senior executives at RSP Permian, Inc., for several years up until its acquisition by Concho Resources, Inc., in July 2018 for almost $10 billion. Both also were co-CEOs of Switchback- I, another SPAC, until it acquired Chargepoint, Inc. in another de-SPAC transaction. The Proxy Statement further noted, "The officers and directors of Switchback have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with the experience and sector expertise of Goldman Sachs, enabled them to make the necessary analyses and determinations regarding the Business Combination."

91.    The Proxy also stated that Switchback's Board relied on the following forecasted financial information for Bird, which was provided to Switchback by Bird's management, and was reiterated in the Proxy to shareholders:

- 29 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

The key elements of the projections provided by Switchback management to the Switchback Board are as follows:

| | Fiscal Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018A | 2019A | 2020A | 2021P | 2022P | 2023P |
| | *(in millions, unless otherwise noted)* | | | | | |
| Rides | 24 | 40 | 18 | 37 | 76 | 170 |
| Average Rides per Deployed Vehicle Per Day | 2.8x | 2.5x | 1.3x | 1.4x | 1.9x | 2.4x |
| Average Deployed Vehicles (in thousands) | 23 | 44 | 38 | 70 | 107 | 198 |
| Gross Transaction Value[1] | $79 | $162 | $115 | $219 | $447 | $897 |
| Revenue | $58 | $151 | $95 | $188 | $401 | $815 |
| Ride Profit (before Vehicle Depreciation)[2] | $(91) | $(3) | $16 | $62 | $169 | $425 |
| Gross Margin | $(212) | $(136) | $(24) | $21 | $110 | $308 |
| Adjusted EBITDA[3] | $(194) | $(229) | $(182) | $(96) | $(28) | $144 |

75. 92. The financial metrics presented by Defendants painted a picture of a company that was growing rapidly, expanding its customer base, and on the cusp of turning profitable—in other words, a company ripe for entering the public market.

76. 93. But there was a problem: the numbers were not real. Bird's revenue figures recognized the full dollar value of all scooter rides. As described above, however, scooter riders were able to carry negative balances, and Bird *never* assessed the likelihood of collecting on those negative balances.

77. 94. Thus, Bird was systematically and serially overstating its Sharing Revenue. Because Sharing Revenue made up almost all of Bird's total revenues, and because its other financial metrics depended on total revenue, Bird overstated virtually all the key numbers it was using to support the merger.

78. 95. This was an obvious error. Bird was well-aware that its electric scooter-riding clientele was relatively young. In fact, it cited its customers' relative youth when touting its growth prospects to potential investors before the merger vote. But the company did not account for the fact that its younger ridership also made its negative wallet balances less collectable.

79. 96. But Defendants successfully hid this critical information from shareholders in the leadup to the merger vote. On November 2, 2021, Switchback shareholders voted to approve the business combination between Switchback and Bird. Bird shares began trading on the New York Stock Exchange on November 5, 2021.

- 30 -

F.G.   **Bird Repeatedly Meets and Exceeds Guidance as a Result of Its Improper Revenue Recognition Practices**

80.97.Defendants continued to mislead investors after the merger was approved. By overstating its revenues in its first two full quarters after becoming a public company, Bird was able to make it appear as though it had hit or even exceeded its guidance, creating illusions of momentum and success.

81.98.Bird reported its financial results for the third quarter of 2021 in November, about two weeks after the merger effective date. In those financials, Bird claimed Sharing Revenue of $65.4 million. This figure overstated its Sharing Revenue by almost $4.3 million, or over 7%. Bird attributed its apparently blistering growth to "an increase in the number of Rides[.]"

82.99.In the accompanying press release, Defendant VanderZanden stated that the results illustrated a "path to profitability driven by strong execution and compelling unit economics," while Defendant Ling stated that Bird had "exceeded our expectations year-to-date for revenue, gross margin, Ride Profit, and Adjusted EBITDA," calling out its "world-class operations team" for delivering consistent improvement.

83.100.     In a conference call later that day, Defendants VanderZanden and Ling repeated the false Sharing Revenue figure and other related metrics, attributing the financial growth to a variety of factors other than an overstatement of revenues: "strengthening demand across regions," "continued benefits from the roll out of our new Bird Three [scooter]," "growth in our long-tail markets," "continued strength from our Fleet Manager program," "continued progress on expanding our deployed vehicle fleet," and "strong utilization[.]" Defendant Ling (falsely) claimed that Bird had "exceeded our expectations year-to-date, with outperformance across revenue, gross margin, Ride Profit, and Adjusted EBITDA," and as a result, raised its fiscal 2021 outlook. In that earnings report, the company forecasted total 2021 revenues of between $195 million and $205 million.

- 31 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

84.101.    Several weeks later at the Credit Suisse Technology Conference on December 1, 2021, Defendant VanderZanden repeated the false and misleading financial information to investors, claiming that Bird "did $65 million in revenue [in Q3 2021]. Adjusted EBITDA was negative $5 million, which is something we're very, very proud of and excited about."

85.102.    Several months later, when Bird reported its financial results for full year 2021—its first full-year results as a public company, and after the conclusion of its first quarter as a public company—Bird reported record FY 2021 total revenues of $205.1 million, exceeding its forecast. Bird claimed FY 2021 Sharing Revenue of $187.327 million and Q4 2021 Sharing Revenue of $45.013 million. These figures overstated FY 2021 and Q4 2021 Sharing Revenues by 8.5% and 11.1%, respectively.

86.103.    In the earnings call accompanying the release of the full-year results, both Defendant VanderZanden and Defendant Ling emphasized this (apparent) success. Defendant VanderZanden claimed that the Company had "exceed[ed] increased expectations," delivering "in line with the top end of our guidance[.]" Defendant Ling reiterated that Bird had "delivered revenue of $205 million, achieving the high end of our guidance range[.]" Both VanderZanden and Ling attributed the company's growth to factors including "the hard work, passion, and dedication of our incredible team," "the support of our riders, city partners, and suppliers," "vehicle innovation and fleet manager operating model," "demand improvements," and "the strong rebound in consumer demand," but never mentioned concerns regarding collectability. The effect of this report was to drive home to investors the image of a company on the upswing.

87.104.    But Bird's claimed $205.1 million full year 2021 total revenue was a mirage. In fact, the true figure was only $190.5 million. Not only had Bird not exceeded its full year 2021 guidance; in reality, the company *missed* its guidance

- 32 -

011147-11/2321628 V1Compare Result 7 12/18/2023

entirely. Bird's inflated revenue figures allowed it to avoid issuing a disappointing earnings report and the accompanying negative publicity.

88.105.    In the same earnings release in which it claimed $205.1 million in full year 2021 total revenue, Bird also forecast 1Q 2022 total revenue of between $34.0 million and $36.0 million.

89.106.    When Bird released its first quarter financial metrics several months later, on May 16, 2022, it announced that it had, for a second consecutive quarter, exceeded its guidance, earning $38.0 million in total revenue and Sharing Revenue of $33.577 million. This Sharing Revenue figure represented an overstatement of $2.603 million, 8.4% of Bird's true Sharing Revenue figure of $30.974 million.

90.107.    In the Form 8-K announcing Bird's 1Q 2022 results, Defendant VanderZanden falsely claimed, "Our first quarter revenue performance exceeded our guidance range." He attributed Bird's performance to "demand recovery," "leading technology," and "operating model efficiencies," and Defendant Ling cited "improving unit economics."

91.108.    In the earnings call later that day, Defendant VanderZanden again boasted that Bird had "exceeded our guidance range" (it had not), and Defendant Ling repeated the same false total revenue figure of $38 million.

92.109.    Bird's 1Q 2022 total revenue did not exceed its guided range. The Company actually earned $35.4 million, within its guided range.

93.110.    On May 18, 2022, at the Needham Tech & Media Conference, Defendant VanderZanden returned to Bird's false FY 2021 revenue figure, claiming that Bird "did $205 million of top line revenue, grew over 100% last year."

94.111.    On August 15, 2022, Bird reported its 2Q 2022 financials, claiming quarterly Sharing Revenue of $72.395 million and YTD Sharing Revenue of $105.972 million. These figures represented overstatements of true Sharing

- 33 -

Revenue figures of 15.8% and 13.4%, respectively. Bird claimed that Sharing Revenue growth "was primarily driven by an increase in the number of Rides[.]"

95.112.    Fox Advisors, an analyst covering Bird, wrote the following day about the emphasis Bird placed on its "still healthy unit economics." The analyst made the same point the following week, emphasizing Bird's "already healthy unit economics, especially for a four-year old business[.]"

96.113.    On August 19, 2022, Goldman Sachs Equity Research highlighted Bird's Sharing gross margin, which derives from Sharing Revenue, as a positive from Bird's quarterly results.

97.114.    By all appearances, Bird was an exciting growth story, exceeding its guidance in its first two quarters as a public company.

98.115.    But the truth was very different. Bird had *not* beat its guidance at all.

99.116.    The truth was not apparent at the time: Bird did not provide accurate financial metrics until many months later (discussed *infra*). As a result, investors and the broader market were misled into believing that Bird was growing far more quickly than it truly was.[4]

---

[4] Ali Griswold, "Angry Bird," OVERSHARING.SUBSTACK.COM (Dec. 13, 2022), https://oversharing.substack.com/p/angry-bird.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023



**Bird inflated revenues for 2.5 years**

The e-scooter firm said it recorded revenue for rides that customers didn't have enough money in their digital Bird wallets to pay for, and for which "collectability was not probable"

The additions came to $31.6 million from Q1 2020 through Q2 2022

*Subscribe to the newsletter at oversharing.substack.com*

Chart: Ali Griswold/Oversharing · Source: SEC · Created with Datawrapper

## ~~G.~~**H.**  The Façade Begins to Crumble

~~100.~~117.      As time passed, Bird's missing revenue became more difficult to hide.

~~101.~~118.      The Company reported its inflated 1Q 2022 financial metrics in May 2022. The next month, on June 29, 2022, Bird announced that Defendant VanderZanden had been replaced as President by Shane Torchiana, effective that day, but that VanderZanden would remain CEO and Chairman of the Board.

~~102.~~119.      On August 15, 2022, Bird reported its financial results for the second quarter of 2022. To keep up with its inflated projections, Bird in turn announced even more inflated financial results. Whereas Bird's 1Q 2022 revenue was overstated by $2.6 million, its second quarter revenue overstatement was almost four times larger, and at $72.395 million represented an overstatement of its true Sharing revenue figure of $9.9 million, or over 15.8%, of its true Sharing revenue of $62.498 million. Bird reported this inflated figure to the market on August 15, 2022.

- 35 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

103.120.     As described below, a month after reporting these false 2Q 2022 numbers, Bird abruptly and unexpectedly terminated the executives responsible for Bird's false financial statements.

**H.I.   The Truth Emerges**

104.121.     The risks posed by Defendants' misrepresentations and omissions to investors concerning Bird's true financial performance began to materialize and ultimately were revealed through a series of disclosure events beginning first on September 21, 2022, when after trading hours, Bird's Board of Directors announced that it was ousting its most senior executives—the same individuals who orchestrated the alleged accounting fraud. Specifically, the Board disclosed that effective immediately it was replacing the Company's Chief Executive Officer, Defendant Travis VanderZanden, by promoting President Shane Torchiana to Chief Executive Officer. Second, the Board disclosed that it had also immediately replaced existing Chief Financial Officer Defendant Yibo Ling with Mr. Ben Lu. Third, the Board announced that it had promoted former Senior Vice President of Engineering Lance Bradley as Chief Technology Officer. Finally, the Board disclosed that Director Justin Kan had resigned from the Board, effective immediately.

105.122.     Defendant VanderZanden, who would remain at Bird as the Chairman of its Board of Directors, did not tie the Board's executive leadership changes with Bird's improper revenue recognition practices and erroneous financial reporting. Instead, in his prepared statement quoted in the Board's press release, VanderZanden was able to maintain artificial inflation in the stock by linking the announced organizational changes with the Company's plan to increase profitability:

> The organizational changes announced today reaffirm our commitment to positioning Bird for long-term profitable growth and we continue to expect positive adjusted EBITDA in the third quarter of 2022. We believe this long-planned transition strengthens a world-class executive team with a record of delivering results, public company expertise, and a focus on driving key stakeholder

- 36 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

value.- Under new leadership, the company will continue to prioritize cost optimization, without losing sight of our long-term commitment to making cities more livable and sustainable.

106.123.    On this news, share prices of Bird plummeted $.05 per share, or over 12.5%, from the closing price of $.4001 per share on September- 21, 2022, to the close price of $.3501 per share on September- 22, 2022, damaging investors.

107.124.    Then, on November- 14, 2022, prior to the opening of the market, Bird shocked investors when it filed a Form 8-K announcing that the Company had overstated its revenue for more than two years by recognizing unpaid customer rides. The Form 8-K stated that Bird's audit committee determined that the company's financial reports spanning the first quarter of 2020 through the second quarter of 2022 "should no longer be relied upon." Specifically, the Company disclosed that its Audit Committee- discovered the discrepancy- while preparing Bird's financial statements for the quarter ended September- 30, 2022. The Form 8-K explained said that Bird had recorded revenue on certain trips even when customers lacked sufficient "preloaded 'wallet' balances." The internal investigation further found that the company's "disclosure controls and procedures are not effective at a reasonable assurance level-." In pertinent part, the Form 8-K stated:

> On November 11, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Bird Global, Inc. (the "Company"), after discussion with management, determined that *(i)- the Company's audited consolidated financial statements as of December- 31, 2021 and 2020, and for the years then ended, and quarterly periods within those years*, included in the Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on March— 15, 2022, (ii)— *its condensed consolidated financial statements as of March- 31, 2022*, and for the three months then ended, included in the Quarterly Report on Form 10-Q filed with the SEC on May— 16, 2022 and (iii)— *its condensed consolidated financial statements as of June- 30, 2022*, and for the three and six months then ended, included in the Quarterly Report on Form 10-Q filed with the SEC on August- 15,

- 37 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2022 (collectively, the "Original Filings", and each such quarterly or annual period covered therein, an "impacted period"), *should no longer be relied upon*. *Similarly, any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing the Company's financial results contained in the Original Filings should no longer be relied upon.*

The determination results from *an error identified in connection with the preparation of the Company's condensed consolidated financial statements* as of September 30, 2022, and the three and nine months then ended, related to its business system configuration *that impacted the recognition of revenue on certain trips completed by customers of its Sharing business ("Rides") for which collectability was not probable. Specifically, for certain customers with insufficient preloaded "wallet" balances, the Company's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded. The Company believes the error resulted in an overstatement of Sharing revenue in the consolidated statements of operations for the impacted periods and an understatement of deferred revenue in the consolidated balance sheets as of the end of each impacted period.*

The Company intends to amend the Original Filings as soon as practicable. In connection with the restatement, management has reevaluated the effectiveness of the Company's disclosure controls and procedures. Management has concluded that the Company's disclosure controls and procedures are not effective at a reasonable assurance level, due to a material weakness in its internal control over financial reporting related to the ineffective design of controls around its business systems that resulted in the recording of revenue for uncollected balances following the completion of certain Rides that should not have been recorded. The Company is in the process of designing and implementing controls to remediate these deficiencies.

(Emphasis added).

- 38 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

125. In addition, Bird issued a "Going Concern" warning telling investors that the Company may not have enough funds to continue its shared micromobility business over the next year:

**Going Concern**

The Company's ability to fund working capital, make capital expenditures, and service its debt will depend on its ability to generate cash from operating activities, which is subject to its future operating success, and obtain financing on reasonable terms, which is subject to factors beyond its control, including general economic, political, and financial market conditions. The capital markets have in the past experienced, are currently experiencing, and may in the future experience, periods of volatility that could impact the availability and cost of equity and debt financing and there can be no assurances that such financing will be available to the Company on satisfactory terms, or at all. As of September 30, 2022, the Company had $38.5 million in unrestricted cash and cash equivalents which, without additional funding, will not be sufficient to meet the Company's obligations within the next twelve months. If the Company is unable to raise additional capital or generate cash flows necessary to expand its operations and invest in continued innovation, it may not be able to compete successfully and may need to scale back or discontinue certain or all of its operations in order to reduce costs or seek bankruptcy protection, which would harm its business, financial condition, and results of operations. As such, these factors raise substantial doubt about the Company's ability to continue as a going concern. Accordingly, the Company plans to continue to closely monitor its operating forecast, reduce its operating expenses, and pursue additional sources of outside capital. Along with this global footprint realignment, the Company is targeting additional reductions in its operating expenses.

108.126. Concurrently with the filing of the Form 8-K, on November 14, 2022, before the market opened, Bird also filed a notification of late filing on Form NT10Q with the SEC, indicating that Bird would not be able to file its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022 (the "Form 10-Q") within the prescribed time period due to the pending restatement of the

- 39 -

011147-11/2321628 V1Compare Result 7 12/18/2023

Company's audited consolidated financial statements for the years ended December_31, 2021 and 2020 (and quarterly periods within those years), and unaudited condensed consolidated financial statements for the interim quarterly periods ended June_30, 2022 and March_31, 2022 (the "Affected Periods"), as previously disclosed in the Company's Form 8-K.

~~109.~~127.    On this news, share prices of Bird plummeted $.0688 per share,



or over 13%, from the closing price of $.4326 per share of the prior trade date of November_11, 2022, to the close price of $.3638 per share on November_14, 2022, damaging investors.

~~110.~~128.    Later that same day on November_14, 2022, five minutes after the close of the market at 4:05 ~~pm~~p.m. Eastern time, Bird issued a press release announcing its unaudited Third Quarter 2022 financial results. Significantly, the press release compared Bird's financial results for both the three months ended September_30, 2022, and nine months ended September_30, 2022, to estimated

- 40 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

restated financial results for the same periods in 2021 (the "prior year period"). Specifically, the restated results reflected negative adjustments to Sharing revenue of $12.7 million for the nine months ended September 30, 2022, and $4.3 million and $10.1 million for the three and nine months ended September 30, 2021. The negative revenue adjustment resulted in similar decreases in metrics tied to revenue for the year prior period, including gross margin, sharing gross margin, ride profit, net loss, and adjusted EBITDA.

111.129.    In the press release, Bird's new CFO Ben Lu revealed further deficiencies in Bird's accounting and financial reporting processes. In particular, Lu revealed that in addition to failing to analyze collectability for ride fees associated with customers with insufficient preloaded "wallet" balances, the Company similarly failed to analyze the financial impact for customers with preloaded wallet balances that Bird did not expect to be redeemed in the future. Lu explained that as a result of Bird's failure to conduct this analysis, the Company was forced to withdraw its previous 2022 revenue guidance:

> While the restatement we announced today related to our overstatement of revenue from failed payments has reduced our historical revenues, we are in the process of completing an unrelated analysis on preloaded wallet balances that we do not expect to be redeemed in the future, which we expect to complete in Q4 2022. Upon completion, we expect to record on-going breakage revenue and anticipate booking a true-up that would increase our revenues next quarter. As a result of these two accounting adjustments, we are withdrawing our previous fiscal year 2022 revenue guidance of $275 to $325 million."

112.130.    Thereafter, beginning at 4:30 pm p.m. Eastern time on November 14, 2022, the Company hosted a Q3 2022 earnings call with securities analysts, during which Mr. Lu expanded on the cause and impact of the restatement on Bird's historical revenue, stating:

- 41 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Now, before I talk about the quarter, let me briefly address the accounting restatements disclosed in our earnings release today. During the evaluation of our rider wallet subledger, we found a design error within our internal back-end IT systems. The systems did not capture some fail payments occurring after the completion of a ride that were incorrectly booked as revenue, resulting in the overstatement of revenue and understatement of deferred revenue.

As a result, we expect to restate our historical revenues by $12.5 million in the first two quarters of fiscal year 2022, $14.6 million in fiscal year 2021 and $4.5 million in fiscal year 2020. More specific details will be included in our amended 10-K and 10-Qs when filed.

113.131.    Media outlets were quick to publish stories about the Company's admission that it had overstated its revenues and identified weaknesses in its internal controls.[5]

114.132.    The following day, on November 15, 2022, Goldman Sachs Equity Research suspended its investment rating, price target, and earnings estimates for the Company, declaring that it "believes that there is currently not sufficient basis for estimating Bird's operating and financial performance going forward, nor for determining an investment rating or price target," and that its "previous investment rating, price target and earnings estimates are no longer in effect and should not be relied upon."

---

[5] Jaclyn Trop, "Bird tells SEC it overstated revenue for two years," TECHCRUNCH (Nov. 14, 2022), https://techcrunch.com/2022/11/14/bird-tells-sec-it-overstated-revenue-for-two-years/https:// techcrunch.com/2022/11/14/bird-tells-sec-it-overstated-revenue-for-two-years/; Chris Bryant, "Is the Electric Scooter Apocalypse Finally Upon Us?," THE WASHINGTON POST (Nov. 15, 2022), https://www.washingtonpost.com/business/is-the-electric-scooter-apocalypse-finally-upon-us/2022/11/15/8fe78c4e-64b9-11ed-b08c-3ce222607059_story.html.https://www.washingtonpost.com/business/is-the-electric-scooter-apocalypse-finally-upon-us/2022/11/15/8fe78c4e-64b9-11ed-b08c-3ce222607059_story.html.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

115.133.    On this news, share prices of Bird plummeted $.0699 per share, or over 19%, from the closing price of $.3638 per share of the prior trade date of November 14, 2022, to the close price of $.2939 per share on November 15, 2022, damaging investors.

116.134.    Securities analysts and the market continued to digest the Company's adverse disclosures and its financial implications. For example, on November 16, 2022, securities analyst Fox Advisors announced that it was discontinuing coverage of the Company, and media outlets reported how Bird's accounting blunders affected more than just its bottom line but also its credibility with investors.[6] As a result, over the next two trading days, Bird's share price declined another $.056 per share, or over 19%, from the close price of $.2939 per share on November 15, 2022, to the close price of $.2379 per share on November 17, 2022.

117.135.    Finally, on November 18, 2022, before opening of the market, Bird released its restated results for 2020 and 2021, along with the first two quarters of 2022.

118.136.    In its Form 10-K/A, Bird revealed that its 2020 Sharing Revenue was only $75,445,000 ($4,496,000 less than initially reported); its 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported); its 2020 gross margin was negative $25,887,000 (a $2,353,000 greater loss than initially reported); and its 2020 net loss was $208,733,000 (a $503,000 greater loss than reported).

119.137.    That Form 10-K/A also revealed that Bird's 3Q 2021 Sharing Revenue was only $59,729,000 ($4,298,000 less than initially reported); its total revenue was only $61,108,000 ($4,298,000 less than initially reported); its 3Q 2021 gross margin was only $8,222,000 ($5,241,000 less than initially reported); its 2021

---

[6] Alex Wilhelm, "How Bird clipped its own wings: The scooter startup's accounting blunders are about more than its bottom line," TECHCRUNCH (Nov. 16, 2022), https://techcrunch.com/2022/11/16/how-bird-clipped-its-own-wings/.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

net loss was $42,109,000 (a $5,241,000 greater loss than initially reported); its 3Q 2021 net loss per basic and diluted common share was $0.92 (a drop of $0.10 per share); its YTD 2021 Sharing Revenue was only $132,202,000 ($10,112,000 less than initially reported); its YTD 2021 total revenue was only $141,008,000 ($10,112,000 less than initially reported); its deferred revenue was $59,940,000 ($14,608,000 more than initially reported); its YTD 2021 gross margin was only $18,987,000 ($12,255,000 less than initially reported); its YTD 2021 net loss was $168,198,000 (a $11,444,000 greater loss than initially reported); and its YTD 2021 net loss per basic and diluted common share was $3.69 (a drop of $0.23 per share).

120.138.    The Form 10-K/A further revealed that Bird's Q4 2021 Sharing Revenue was only $40,527,000 ($4,486,000 less than initially reported); its Q4 2021 total revenue was only $49,536,000 ($4,486,000 less than originally reported); its Q4 2021 gross margin was only $3,678,000 ($4,486,000 less than initially reported); its Q4 2021 net loss was $46,726,000 (a $7,147,000 greater loss than initially reported); and its Q4 2021 net loss per basic and diluted common share was $0.26 (a drop of $0.04 per share).

121.139.    Finally, the Form 10-K/A revealed the truth about Bird's FY 2021 financials. In reality, Bird's FY 2021 Sharing Revenue was only $172,729,000 ($14,598,000 less than initially reported); its FY 2021 total revenue was only $190,544,000 ($14,598,000 less than initially reported); its deferred revenue was $62,439,000 ($19,094,000 more than initially reported); its FY 2021 gross margin was only $22,665,000 ($16,741,000 less than initially reported); its FY 2021 net loss was $214,924,000 (a $18,591,000 greater loss than initially reported); its FY 2021 net loss per basic and diluted common share was $2.74 (a drop of $0.23 per share); and its FY 2021 adjusted EBITDA was negative $80.9 million ($14 million worse than originally reported).

122.140.    One Form 10-Q/A concerned Bird's Q1 2022 financial metrics. The restatement revealed that Bird's Q1 2022 Sharing Revenue was only $30,974,000 ($2,603,000 less than initially reported); its Q1 2022 total revenue was only $35,375,000 ($2,603,000 less than originally reported); its deferred revenue was $64,454,000 ($21,697,000 more than originally reported); its Q1 2022 gross margin was only $820,000 ($2,603,000 less than initially reported); its Q1 2022 net income was $7,748,000 ($2,603,000 less than initially reported); its Q1 2022 net profit per basic and diluted common share was revised from $0.04 to $0.03 (a drop of $0.01 per share); and its Q1 2022 adjusted EBITDA was negative $39.4 million ($2.6 million less than originally reported).

123.141.    The other Form 10-Q/A addressed Bird's Q2 2022 financial metrics. The restatement revealed that Bird's 2Q 2022 Sharing Revenue was only $62,498,000 ($9,897,000 less than initially reported); its 2Q 2022 total revenue was only $66,765,000 ($9,897,000 less than initially reported); its 2Q 2022 gross margin was negative $23,242,000 (a $9,897,000 greater loss than initially reported); its 2Q 2022 net loss was $320,316,000 (a $9,897,000 greater loss than initially reported); its 2Q 2022 net loss per basic and diluted common share was $1.18 (a drop of $0.04 per share); its 2Q 2022 adjusted EBITDA of negative $29.0 million ($9.9 million worse than initially reported); its YTD 2022 Sharing Revenue was only $93,471,000 ($12,501,000 less than initially reported); its YTD 2022 total revenue was only $102,139,000 ($12,501,000 less than initially reported); its deferred revenue was $69,171,000 ($31,595,000 more than originally reported); its YTD 2022 gross margin was negative $22,423,000 (a $12,501,000 greater loss than initially reported); its YTD 2022 net loss was $312,569,000 (a $12,501,000 greater loss than initially reported); its YTD 2022 net loss per basic and diluted common share was $1.15 (a drop of $0.04 per share); and its YTD 2022 adjusted EBITDA was negative $68.5 million ($12.5 million worse than initially reported).

124.142.    In addition, the Company released its Q3 2022 financial statements for the quarterly period ended September 30, 2022, on Form 10-Q, wherein Bird revealed the material weaknesses in the Company's disclosure controls and procedures that the Audit Committee uncovered in connection with its internal investigation. The Company stated, in pertinent part:

> As disclosed in our 2021 Form 10-K/A, in connection with the preparation of this Quarterly Report, we identified errors in our business system configuration that impacted the recognition of revenue on certain Rides for which collectability was not probable. Specifically, for customers with insufficient preloaded "wallet" balances, following the completion of Rides our business systems recorded revenue for uncollectible balances. On November 11, 2022, the Audit Committee of our Board of Directors, after discussion with our management, concluded that (i) our consolidated financial statements for the years ended December 31, 2021 and 2020, and the quarters therein and (ii) our condensed consolidated financial statements for the quarterly periods ended March 31, 2022 and June 30, 2022, should not be relied upon. ***In connection with the restatement of our financial statements for the foregoing periods, management identified a material weakness in our internal control over financial reporting as of December 31, 2021 and 2020 and September 30, 2022 related to the ineffective design of controls around our business systems and the lack of a review control to detect that our business systems failed to constrain revenue that resulted in the recording of revenue for uncollectible balances following the completion of certain Rides that should not have been recorded in prior periods.***

125.143.    The Company further explained that while it had developed a plan to rectify these material weaknesses, the Company could not provide a timetable as to when these weaknesses would be fully remediated:

> We have identified and begun to implement several steps, as further described below, designed to remediate the foregoing material weakness and to enhance our overall control environment. We will not consider the material weakness remediated until our enhanced controls are operational for a sufficient period of time and tested,

- 46 -

enabling management to conclude that the enhanced controls are operating effectively.

In order to remediate this material weakness, we are in the process of implementing appropriate analytical and review controls of our business systems to ensure revenue is not recorded when customers with insufficient preloaded wallet balances complete Rides for which the balance is uncollectible, including additional review of the wallet subledger for negative balances and additional review of failed payments in our business system configuration. Further, we are in the process of implementing controls to prevent customers from depleting their preloaded wallet balance below zero dollars during a Ride. While the foregoing measures are intended to effectively remediate the material weakness described in this Item 4, it is possible that additional remediation steps will be necessary. As such, as we continue to evaluate and implement our plan to remediate the material weakness, our management may decide to take additional measures to address the material weakness or modify the remediation steps described above. The material weakness cannot be considered fully remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. Until this material weakness is remediated, we plan to continue to perform additional analyses and other procedures to help ensure that our consolidated financial statements are prepared in accordance with GAAP.

126.144.    On this news, share prices of Bird fell another $0.0336 per share, or over 14%, from the closing price of $.2379 per share on November 17, 2022, to the close price of $.2043 per share on November 18, 2022, damaging investors.

- 47 -

011147 11/2321628 V1Compare Result 7 12/18/2023





## I.J.    The Significance of the Restatement and Disclosed Internal Control Weaknesses

127.145.    Restatements are required for "material" accounting errors that existed at the time financial statements were prepared. *See* SFAS 154. (ASC 250-10). By issuing the Restatement, Bird acknowledged that its financial statements for the

- 48 -

011147 11/2321628 V1Compare Result 7 12/18/2023

restated periods were materially inaccurate and did not comply with GAAP and were therefore false and misleading when issued. 17 C.F.R. §- 210.4-01(a)(1).

128.146.    Internal controls are those systems and processes which are designed to ensure the accuracy of publicly reported information by, among other things, assuring that balance sheet entries have documented support, and that significant variations from established procedures cannot be made without multiple levels of review and approval. AU §- 319.06, entitled *Internal Control in a Financial Statement Audit*, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a)- reliability of financial reporting, (b)- effectiveness and efficiency of operations, and (c)- compliance with applicable laws and regulations."

129.147.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A)- make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B)- devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that … transactions are recorded as necessary … to permit preparation of financial statements in conformity with [GAAP]." 15 U.S.C. § 78m(b)(2). These provisions require an issuer to employ and supervise reliable personnel to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

130.148.    Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in 15 U.S.C. § 78m-o under the Exchange Act. During the Class Period, Defendants VanderZanden and Ling each attested that they were responsible for

- 49 -

designing and maintaining compliance with adequate internal control procedures, that they had each reviewed the Company's Reports on Forms 10-K and 10-Q before they were filed, and that pursuant to §~302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), they had: (i)~ensured that material information "is made known to us by others" within Bird during the period covered by the Report; (ii)~personally reviewed and evaluated the effectiveness of those controls within the last 90 days; and (iii)~that any deficiencies in those controls and procedures had been disclosed in the Forms 10-K and 10-Q, as well as to the Company's outside auditors and internal audit committee.

~~131.~~149.    For example, on May~16, 2022, the Company filed its Q1 2022 10-Q. The Q1 2022 10-Q included Sarbanes-Oxley certifications signed by Defendants VanderZanden and Ling, in which each certified the following regarding the Company's internal controls and procedures pursuant to Sarbanes-Oxley:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Bird Global, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

- 50 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Omitted];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

132.150.   Defendants VanderZanden and Ling signed identical certifications that accompanied Bird's Reports on Forms 10-Q and 10-K throughout the Class Period.

133.151.   The Sarbanes-Oxley certifications in each of Bird's Forms 10-Q and 10-K were materially false and misleading because, for the reasons provided in the immediately preceding subsection, the Company did not maintain appropriate internal controls in many aspects of its business.

- 51 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

134.152.   Bird's wholesale failure of internal controls demonstrates that the Sarbanes-Oxley certifications signed by Defendants VanderZanden and Ling were deliberately and recklessly false, and misled investors to believe that Bird's internal controls were adequate to ensure accurate financial reporting. Indeed, Bird's belated disclosures demonstrate that the internal control systems and practices certified by Defendants VanderZanden and Ling were virtually non-existent. The above practices show a deliberate and reckless disregard for proper conduct and a pervasive and systematic exploitation of the lack of controls to facilitate Defendants' accounting manipulations and to inflate Bird's financial results.

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS

**A.   May 12, 2021, SEC Filing Announcing Merger**

135.   On May 12, 2021, Switchback and Bird filed an 8-K announcing their intent to merge. The 8-K was, signed by Defendant Mutrie.

153.   The 8-K, attached a Press Release, dated May 12, 2021, a Conference Call Script, an Investor Presentation and Audited Consolidated Financial Statements of Bird Rides, Inc.

136.154.   In Bird's audited consolidated financial statements. For attached to the 8-K signed by Mutrie, for the year ended December 31, 2020, the audited consolidated financial statements stated revenue from Bird's Sharing business ("Sharing Revenue") of $79,941,000, total revenue of $94,601,000, deferred revenue of $42,900,000, a gross margin of negative $23,534,000, a net loss of $208,230,000, and adjusted EBITDA of negative $179,600,000.

137.155.   The preceding statements in Bird's consolidated financial statements relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)   Unbeknownst to investors, for the year ended December 31, 2020, Bird had improperly recognized Sharing Revenue. Specifically, for certain

- 52 -

customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's 2020 Sharing Revenue was only $75,445,000 ($4,496,000 less than initially reported);

(ii)    Bird's 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported);

(iii)    Bird's deferred revenue was $47,396,000 ($4,496,000 more than initially reported);

(iv)    Bird's 2020 gross margin was negative $25,887,000 (a $2,353,000 greater loss than initially reported);

(v)    Bird's 2020 net loss was $208,733,000 (a $503,000 greater loss than reported);

(vi)    Bird's 2020 net loss per basic and diluted common share was $5.59 (a drop of $0.02 per share); and

(vii)    Bird's 2020 adjusted EBITDA was negative $181,400,000 (a $1,800,000 greater loss than initially reported).

138.156.    Bird stated that its balance sheet and consolidated financial statements were presented "in accordance with accounting principles generally accepted in the United States of America ('GAAP')." Bird further stated that it accounted for Sharing Revenue "as operating lease revenue pursuant to ASC 840, Leases, and records revenue upon completion of each ride," and that it was "in the

- 53 -

process of evaluating [the] impact" of ASC 842, a new accounting standard for recognizing lease revenue that replaced ASC 840.

139.157.    The preceding statements in Bird's consolidated financial statements relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

140.  As noted above, Switchback also attached an investor presentation to the May 12, 2021, 8-K.

141.158.    signed by Mutrie. That presentation investor presentation cover page reflected Switchback's trademark symbol. The investor presentation claimed, among other things, FY 2020 total revenue of $94.6 million. Also, in the investor presentation, Defendants identified the key drivers of Bird's revenue, including new cities and regions, increased utilization and new form factors:



[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

142.159.    The statement of Bird's total revenue in the investor presentation of Bird's Sharing Revenue and the purported drivers for the total revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2020, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue: Bird's FY 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported).) and in turn total revenue.

(c)    The claims that Bird's revenues were driven by new cities and regions, increased utilization and new form factors are false and misleading because Bird omits the material fact that a material portion of Bird's total revenue was driven by Bird's improper revenue recognition practices in violation of GAAP and the Company's stated revenue recognition policies.

160.    The Form 8-K announcement of the business combination also included a press release wherein both Defendants Mutrie and McNeill are quoted as emphasizing Bird's "*compelling current revenues*" as one of the reasons Switchback decided to acquire Bird:

> Jim Mutrie and Scott McNeill, Co-Chief Executive Officers and Directors of Switchback, commented: "As a category creator for the shared micromobility space, Bird has capitalized on its first-mover advantage to address the significant market opportunity while also providing an efficient and eco-friendly transportation alternative. With its market leadership position, experienced and innovative leadership team, *compelling current revenues* and business model, along with identified levers for growth,

- 55 -

> Bird satisfies all the investment criteria we were seeking and we are pleased to announce the definitive agreement for this combination."

161.   Later, on May- 12, 2021, Switchback and Bird hosted an investor call with Defendants Mutrie and VanderZanden acting as the corporate participants. Defendant Mutrie again reiterated Bird's "*compelling current revenues*":

> Bird has all the attributes we look for in a company to partner with a large and growing addressable market opportunity, a market leader with a strong brand and reputation, an experienced management team, *compelling current revenues* and a returns-oriented business model, as well as clearly defined catalysts for growth.

162.   The above-referenced statements pertaining to Bird's "compelling current revenues" in the press release and at the investor call were materially false and misleading and omitted to disclose material facts. Specifically, Defendants failed to disclose that Bird's reported current revenues were materially inflated in that that a material portion of Bird's total revenue was driven by Bird's improper revenue recognition practices in violation of GAAP and the Company's stated revenue recognition policies.

**B.   May 12, 2021 CNBC TechCheck: TechCheck's Bosa speaks with Bird CEO Travis VanderZanden on going public via SPAC – Solicitation Material**

163.   On May 12, 2021, Defendant VanderZanden appeared on CNBC TechCheck on behalf of Bird with Deirdre Bosa to promote the Merger. The transcript of the interview was filed by Switchback pursuant to Rule 425 under the Securities Act of 1933 and deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934 as Solicitation Material in connection with the Merger.[7]

---

[7] Solicitation Materials refer to communications sent to shareholders regarding an issue up for a shareholder vote, including materials sent before a securities issuer furnishes a formal proxy statement. *See* 17 C.F.R. § 240.14a-12. In addition to any proxy statement, SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to § 14(a) of the Exchange Act, extends to solicitations made before furnishing a proxy

- 56 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

164. In response to Ms. Bosa's questions concerning the timing of going public through the SPAC-merger, Defendant VanderZanden emphasized the unit economics Bird had achieved, including its ride profit, which made the timing right for the company to go public.

> **Bosa**: Okay, cool. I want to talk a little bit about the SPAC process. We saw sort of a lull of activity when SPACs came under greater scrutiny from the SEC. We've seen more of them recently. How did you decide to go public by SPAC versus traditional IPO versus direct listing? And instead of raising money in the private markets, which you've obviously been able to do.

> **VanderZanden**: Yeah, so we felt like the timing was right for the company to go public. We really focused on the unit economics over the last two years and, what I like to tell the company, eat our vegetables. ***And now we have positive ride profit of 40%, a positive ride profit of 15% if you exclude vehicle depreciation. And so the unit economics are really working in the business now as we roll out the new vehicles***.

> Bosa: Those are adjusted unit economics, right? That's not sort of straight. That's like adjusted EBITDA that takes into account depreciation on a bunch of other things, right?

> **VanderZanden**: ***Yeah. I'm talking about ride profit before opex, right? So if you just look at the unit economics of the business on every single ride we do, how profitable are we, it's actually 40% positive now globally. And then if you exclude vehicle depreciation, still about 15% positive globally on the unit economics. By the way, that's H2 of last year during a COVID year where you had depressed utilization***.

165. The above-referenced statements in the May 12, 2021 CNBC TechCheck interview were materially false and misleading and omitted to disclose material facts. As explained herein, the cited 40% ride profit margin for the second half of 2020 was materially inflated as it depends on Bird's reported Sharing Revenue

---

statement that are made pursuant to and in compliance with the conditions of SEC Rule 14a-12, 17 C.F.R. § 240.14a–12.

- 57 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which was materially inflated. Moreover, the claim that Bird's increased ride profit margin was driven by new vehicles is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus ride profit, was driven in part by Bird's false and misleading statement of its Sharing Revenue

**B.C.    May 14, 2021, Merger Registration Statement**

143.166.    On May 14, 2021, Bird and Switchback filed a registration statement on Form S-4 with the SEC pursuant to the proposed Business Combination. It was signed by Defendants Mutrie, VanderZanden, and Ling. For the year ended December 31, 2020, the Form S-4 stated revenue from Bird's Sharing business ("Sharing Revenue") of $79,941,000, total revenue of $94,601,000, deferred revenue of $42,900,000, a gross margin of negative $23,534,000, a net loss of $208,230,000, and adjusted EBITDA of negative $179,600,000.

144.167.    The preceding statements in Bird's Form S-4 relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2020, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's 2020 Sharing Revenue was only $75,445,000 ($4,496,000 less than initially reported);

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

(ii)    Bird's 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported);

(iii)    Bird's deferred revenue was $47,396,000 ($4,496,000 more than initially reported);

(iv)    Bird's 2020 gross margin was negative $25,887,000 (a $2,353,000 greater loss than initially reported);

(v)    Bird's 2020 net loss was $208,733,000 (a $503,000 greater loss than reported);

(vi)    Bird's 2020 net loss per basic and diluted common share was $5.59 (a drop of $0.02 per share); and

(vii)    Bird's 2020 adjusted EBITDA was negative $181,400,000 (a $1,800,000 greater loss than initially reported).

145.168.    The Registration Statement stated that Bird's balance sheet and consolidated financial statements were presented "in accordance with accounting principles generally accepted in the United States of America ('GAAP')." Bird further stated that it accounted for Sharing Revenue "as operating lease revenue pursuant to ASC 840, Leases, and records revenue upon completion of each ride," and that it was "in the process of evaluating [the] impact" of ASC 842, a new accounting standard for recognizing lease revenue that replaced ASC 840.

146.169.    The preceding statements in Bird's Form S-4 relating to compliance with GAAP and the securities laws were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

**C.D.    June 24, 2021, Research Analyst Day – Solicitation Material**

147.170.    On June 24, 2021, Bird held a research analyst day to generate support for its upcoming merger vote. Defendant VanderZanden (Founder and CEO),

- 59 -

011147 11/2321628 V1Compare Result 7 12/18/2023

Yibo Ling (CFO), Scott Rushforth (Chief Vehicle Officer), Renaud Fages (SVP, Global Operations), Shane Torchiana (SVP, Corporate Development & Strategy), Jim Mutrie (Switchback Founder & CEO), and Scott McNeill (Switchback Founder & CEO) delivered a presentation at the research analyst day.

171.   At the conference, Defendants jointly published an investor presentation entitled "Bird: Research Analyst Day, June 24, 2021." The cover page of the investor presentation reflected a Switchback trade and the entire document was filed by Switchback on June 25, 2021 pursuant to Rule 425 under the Securities Act of 1933 and deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934 as Solicitation Material in connection with the Merger.

148.172.   Presenting Bird's financial outlook, Defendant Ling shared slides reporting figures from 2020 and the first quarter of 2021 for Sharing Revenue, reflecting claimed FY 2020 Sharing Revenue of $79.9 million, FY 2020 Total Revenue of $94.6 million, claimed Q1 2021 Sharing Revenue of $21.6 million, and Q1 2021 Total Revenue of $25.7 million.

149.173.   The preceding statements in the press release relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)   Unbeknownst to investors, for the year ended December 31, 2020, and quarter ended March 31, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)   Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

- 60 -

(i)      Bird's FY 2020 Sharing Revenue was only $75,445,000 ($4,496,000 less than initially reported);

(ii)      Bird's FY 2020 total revenue was only $90,105,000 ($4,496,000 less than originally reported);

(iii)      Bird's Q1 2021 Sharing Revenue was $20,226,000 ($1,423,000 less than originally reported); and

(iv)      Bird's Q1 2021 total revenue was only $25,670,000 ($1,423,000 less than originally reported).

150.174.      Defendant Ling shared a slide reporting "key drivers" of Bird's revenue and gross margin. These drivers included "new cities and regions," "increased utilization," "new form factors," "variable [fleet manager] cost structure," "lower city-level overhead," and "vehicle improvements":




151.175.      The statements that Bird's financial performance was driven by its expansion into new markets, increased utilization, new form factors, cost structure, overhead and vehicle improvements are false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total

- 61 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

**E.    August 12, 2021 Canaccord Genuity 41st Annual Growth Conference – Solicitation Material**

176.   On August 12, 2021, Bird participated in the Canaccord Genuity 41st Annual Growth Conference to generate support for its upcoming Merger vote. Defendant VanderZanden participated in a question and answer session with internet analyst Michael Graham. The transcript of the conference was filed by Switchback on August 16, 2021 pursuant to Rule 425 under the Securities Act of 1933 and deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934 as Solicitation Material in connection with the Merger.

177.   When asked by Mr. Graham to touch on Bird's unit economics and talk about some of the drivers of the expansion there, Defendant VanderZanden emphasized Bird's ride profit:

> **Graham**: Maybe just touch on your unit economics and talk about some of the drivers of the expansion there
>
> **VanderZanden**: . . . *And as we slipped and cycled out the fleet to the newer vehicles, we immediately saw a big uptick in the unit economics and the ride profit. And then in 2020, we obviously rolled out the fleet manager program and aligned incentives with the fleet managers. And you saw another big step function change in the unit economics at that point And if you look at H2 of last year, we had about 42% ride profit, which we were very happy with, especially considering the depressed utilization we had last year as a result of COVID.* So, now that we have the better vehicles, the fleet manager program and as we come out of COVID, we think we're super well positioned to continue to drive even more margin improvement.

178.   The above-referenced statements at the August 12, 2021 Canaccord Genuity 41st Annual Growth Conference were materially false and misleading and omitted to disclose material facts. As explained herein, the cited 42% ride profit for the second half of 2020 was materially inflated as it depends on Bird's reported

- 62 -

Sharing Revenue which was materially inflated. Moreover, the claim that Bird's increased ride profit margin was driven by new vehicles and the Fleet Manager program is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus ride profit, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

## ~~D.~~F.  August 19, 2021~~,~~ Investor Presentation

~~152.~~179.    On August~~-~~ 19, 2021, Switchback issued a Form 8-K signed by Defendant Mutrie attaching an investor presentation relating to the proposed business combination.

~~153.~~180.    That presentation claimed, among other things, Bird generated FY 2020 total revenue of $94.6~~-~$ million, 1Q 2021 total revenue of $25.7~~-~$ million, and 2Q 2021 total revenue of $60.0~~-~$ million.

~~154.~~181.    The statements in the investor presentation deriving from Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December~~-~~ 31, 2020, and the quarters ended March~~-~~ 31, 2021, and June~~-~~ 30, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's FY 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported);

- 63 -

~~011147 11/2321628 V1~~Compare Result 7 12/18/2023

(ii)    Bird's 1Q 2021 total revenue was only $24,247,000 ($1,423,000 less than originally reported); and

(iii)    Bird's 2Q 2021 total revenue was only $55,654,000 ($4,390,000 less than originally reported).

### E.G.    2Q 2021 Reported Financial Results (August 19, 2021)

#### 1.    False and Misleading Financial Metrics – Solicitation Material

155.182.    On August 19, 2021, Bird issued a press release announcing its financial results for the first quarter and first half ended June 30, 2021 30, 2021. The press release was filed by Switchback pursuant to Rule 425 under the Securities Act of 1933 and deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934 as Solicitation Materials in connection with the Merger.

156.183.    Bird reported, among other things, 2Q 2021 total revenue of $60.0 million, a gross margin of $15.7 million, a net loss of $43.7 million, and an adjusted EBITDA of negative $11.5 million.

157.184.    Bird also reported its financials for the six months ended June 30, 2021. Bird reported, among other things, YTD 2021 Sharing Revenue of $78,287,000, total revenue of $85,714,000, deferred revenue of $44,364,000, a gross margin of $17,779,000, a net loss of $119,886,000, and a net loss of $2.34 per basic and diluted common share.

158.185.    In the press release announcing Bird's financials, Defendant Ling statdded, "*We well exceeded our expectations, including significant outperformance in gross margin, Ride Profit, and Adjusted EBITDA during the second quarter and first half of the year. Specifically, in the first half of this year, we generated Ride Profit Margins of 45%. Additionally, Ride Profit Margins were consistently over 35% for the last four quarters, despite continued COVID headwinds and varying seasonal conditions, and we expect to see continued margin improvement as global demand returns to pre-pandemic levels*."

- 64 -

159.186.    The preceding statements in the press release relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's 2Q 2021 total revenue was only $55,654,000 ($4,390,000 less than initially reported);

(ii)    Bird's 2Q 2021 gross margin was only $10,149,000 ($5,590,000 less than originally reported);

(iii)    Bird's 2Q 2021 net loss was $49,276,000 (a $5,590,000 greater loss than originally reported);

(iv)    Bird's YTD 2021 Sharing Revenue was only $72,474,000 ($5,813,000 less than originally reported);

(v)    Bird's YTD 2021 total revenue was only $79,901,000 ($5,813,000 less than originally reported);

(vi)    Bird's deferred revenue was $54,673,000 ($10,309,000 more than originally reported);

(vii)    Bird's YTD 2021 gross margin was only $10,766,000 ($7,013,000 less than originally reported);

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

(viii)  Bird's YTD 2021 net loss was $126,088,000 (a $6,202,000 greater loss than originally reported); and

(ix)  Bird's YTD 2021 net loss per basic and diluted common share was revised from $2.67 to $2.79 (a drop of $0.12 per share).[8]

### 2.    False and Misleading Identified Drivers for Financial Results – Solicitation Material

160.187.    In the same press release announcing Bird's financials, which was designated as a Solicitation Material in connection with the Merger, Defendant VanderZanden stated, "*Our second quarter financial results reflect significant outperformance compared to our expectations as we continued to deliver industry-leading results driven by strong execution, tailwinds from the easing of COVID-19 restrictions in major markets, and favorable regulatory environments across cities which continue to support increased demand for eco-friendly and naturally socially distanced transportation. Specifically, during the second quarter we drove a 477% increase in revenue over the same period last year and a 36% outperformance relative to our expectations. These results paired with our operational innovations, including our Fleet Manager operating model, and new vehicle introductions further support our ability to achieve our objectives for this fiscal year.*"

161.188.    This statement is false and misleading because Sharing Revenue, and other financial figures that rely on Sharing Revenue, were less than Bird stated. Further, the claims that Bird's financial performance was driven by strong execution, tailwinds from the easing of COVID-19 restrictions, favorable regulatory environments, operational innovations, and new vehicle introductions are false and misleading because Bird omits the material fact that $4.39 million of the

---

[8] Bird explained the discrepancy between (i) the loss per share as originally reported in August 2021 and (ii) the lost per share listed as previously reported in the 10-K/A by stating that "(1)["[w]eighted-average shares have been retroactively restated to give effect to the Business Combination."

- 66 -

$49.6 million claimed increased year-over-year year-to-date total revenue (i.e., 8.9%), is explained by Bird's false and misleading overstatement of its Sharing Revenue.

**3. False and Misleading Statements on August 19, 2021, Q2 2021 Earnings Conference Call**

162.189.    Bird held a conference call on the same day that it released its 2Q 2021 financials to discuss its earnings. In his prepared remarks, Defendant VanderZanden stated:

> *We delivered a record performance in the second quarter and first half of this year, highlighted by second quarter Revenue surpassing expectations by 36%. Drivers of our performance included both macro tailwinds as well as strong execution against our strategic objectives.*
>
> * * *
>
> *In the second quarter of 2021, we generated a record $71.2 million in Gross Transaction Value, a 435% increase year-over-year and a 57% increase compared to the same period in 2019. Ride Profit Margins before Vehicle Depreciation were 49% as our Fleet Manager model and innovative vehicles continued to drive margin improvement, further supporting our path to profitability.*

163.190.    In his prepared remarks, Defendant Ling stated:

> *For the second quarter, we reported GTV of $71.2 million, up 435% against Q2 2020, a period marked by the COVID-19 pandemic, and 57% compared to Q2 2019. Similarly, we realized significant revenue improvement, with second quarter revenue up 477% compared to the same period last year and 43% compared to Q2 2019. The increases in GTV and revenue were largely driven by increases in ride volume and trip duration, as several key markets eased COVID restrictions and riders sought socially distant ways to get around.*
>
> * * *
>
> *Gross margin was positive $15.7 million compared to a loss of $6.1 million in Q2 2020 and a loss of*

- 67 -

*$42.7 million in Q2 2019; this sum of $15.7 million notably exceeded expectations by 194%. Ride profit margin before vehicle depreciation increased by 49% compared to 15% for the prior year period, again exceeding our expectations, in this case by 13 percentage points.* As Travis discussed, we have seen consistently positive Ride Profit Margins since rolling out our Fleet Manager Model, and we expect to see further margin improvement as we continue to optimize our revenue share structure, enhance our hardware and technology, and demand recovers.

*We reported an Adjusted EBITDA loss of $11.5 million in the second quarter. This was the strongest Adjusted EBITDA performance in company history, exceeding expectations by 48% and representing an increase of 73% year-over-year and 76% versus the same period in 2019*.

164.191.    These statements from the August 19, 2021, earnings call are false and misleading.

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including revenue growth, gross margin, ride profit margin, and adjusted EBITDA, is false and misleading because it depends on false and misleading information as an input.

(c)    The claim that Bird's financial performance was driven by strengthening demand, new scooters, growth in long-tail markets, efficiencies in the Fleet Manager model, or improved utilization is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

F.H.   September 2, 2021, **Industry Conference** - **Solicitation Material**

165.192.    On September 2, 2021, Bird participated in a fireside chat with IPO Edge and the Palm Beach Hedge Fund Association. Defendant VanderZanden

- 68 -

011147 11/2321628 V1Compare Result 7 12/18/2023

and Defendant Mutrie represented Bird and Switchback, respectively, at the conference. The transcript of the conference were filed by Bird Global, Inc. pursuant to Rule 425 under the Securities Act of 1933 and deemed filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934 as solicitation materials in connection with the Merger.

193.   At the conference, when Defendant Mutrie was asked by the moderator to discuss what was it about Bird that interested him and Bird them stand out from other players in the market, Defendant Mutrie identified Bird's reported financial performance:

> The second thing was Bird is a real business. It's what I say when I talk about Switchback is we don't like to fund science projects, you have to be more than just a good idea, you have to actually shown that you can run a business and do it well, ***and they had 150 million dollars of revenue in their second year of existence***, it'll be over 400 million next year, so. ***Real revenues and they're outperforming to guidance as well, so I love the fact that it's a real business***.

~~166.~~194.   At the conference, when asked by the moderator to discuss its recently released 2Q 2021 financials, Defendant VanderZanden stated:

> But we did really see a strong bounce back and Q2 year over year, ***revenue was 60 million in Q2 of this year, so year over year that was 477% increase***. Obviously somewhat of a low bar because coming off the, you know, the main COVID year, but ***if you look at over 2019 we were still up 43% over the same period in 2019 and so performance really was driven by you know macro tailwind, strong execution***.
>
> *           *           *
>
> [The] thing I'm most proud of, there is, you know, the fact we beat the SPAC PIPE forecast, you know, on revenue, ***we beat the SPAC PIPE forecast by 36% and ride profit we beat by 13 percentage points, adjusted EBITDA we beat the SPAC PIPE forecast by 48%, at negative 11.5 million in adjusted EBITDA.*** And so you know you're seeing, you know, not just good year over year numbers but outperforming that SPAC PIPE forecast,

- 69 -

which is something we're you know super proud of, I know. … It's really important to us to try to outperform the forecast as much as possible and so that's the thing we're most proud of.

167.195.    Defendants' statements at the September 15, 2021 investor presentation were false and misleading for the following reasons.

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including ride profit, revenue versus forecast, ride profit margins, and adjusted EBITDA, is false and misleading because it depends on false and misleading information (i.e., Sharing Revenue) as an input.

(c)    The claims that Bird's financial performance was driven by its operating model, innovation, and improvements in rides per deployed vehicle per day are false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

## G.I.    September 15, 2021, Industry Conference

168.196.    On September 15, 2021, Bird presented at the Citi Global Technology Virtual Conference. Defendant VanderZanden, Bird's Founder, President, CEO, and Director, represented Bird at the conference.

169.197.    At the conference, when asked by the moderator to identify Bird's "driver of profitability," Defendant VanderZanden stated:

> *Fast forward to Q1 of 2021, during COVID conditions, depressed utilization, all these kind of COVID issues, in Q1 of 2020, we threw off positive 35% ride profit. So, we went from negative 54% pre-COVID to positive 35% during COVID. So, massive improvements quarter-over-quarter on the ride profit side and we're going to continue*

- 70 -

*to focus there. In Q2 of this year, we went from 35% to 49% in ride profit.*

\*        \*        \*

*In Q2, we did – we're now doing $60 million of revenue for the quarter, which was up 477% year-over-year. Obviously 2020 is a low year, but it was up 43% over 2019.*

*But the thing I'm most excited about is that $60 million in revenue in Q2 was 36% above our forecast that we had in this back in the PIPE. And so, we really outperformed on our first quarter relative to the expectations in this back PIPE deal. And that trickled down to ride profit margins. So, ride profit margin I mentioned earlier, 49%. That was 13 percentage points above forecast. And adjusted EBITDA on the bottom line, we ended up only negative $11.5 million, which was about 48% above expectations.*

*And you asked why the strong performance. I think it's, one, lots of hard work going on across the entire company as you can imagine, but two ... great naturally social distance way to get around the city. And so, as a result of cities not locking down, Bird had a very strong quarter and that showed in the results and the big beat of the forecast.*

~~170.~~198.    Defendants' statements at the September 15, 2021, investor presentation were false and misleading for the following reasons.

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including ride profit, revenue versus forecast, ride profit margins, and adjusted EBITDA, is false and misleading because it depends on false and misleading information (i.e., Sharing Revenue) as an input.

(c)    The claims that Bird's financial performance was driven by its operating model, innovation, and improvements in rides per deployed vehicle per day are false and misleading because Bird omits the material fact that the claimed

- 71 -

increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

**H.J.   October 2021 Prospectus**

171.199.     On October- 7, 2021, Bird filed a Prospectus (the "October 2021 Prospectus") on Form 424(b)(3) with the SEC. The October 2021 Prospectus stated Sharing Revenue for the year ended December- 31, 2020, of $79,941,000, total revenue of $94,601,000, deferred revenue of $42,900,000, a gross margin of negative $23,534,000, a net loss of $208,230,000, and an adjusted EBITDA of negative $182,100,000.

172.200.     The preceding statements in the October Prospectus relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)     Unbeknownst to investors, for the year ended December- 31, 2020, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)     Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)     Bird's 2020 Sharing Revenue was only $75,445,000 ($4,496,000 less than initially reported);

(ii)     Bird's 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported);

- 72 -

(iii)    Bird's deferred revenue was $47,396,000 ($4,496,000 more than initially reported);

(iv)    Bird's gross margin was negative $25,887,000 ($2,353,000 greater loss than initially reported);

(v)    Bird's net loss was $208,733,000 (a $503,000 greater loss than reported);

(vi)    Bird's net loss per basic and diluted common share was revised from $5.57 to $5.59 (a drop of $0.02 per share); and

(vii)    Bird's adjusted EBITDA was negative $181,400,000 (a $1,800,000 greater loss than initially reported).

173.201.    Bird stated that its balance sheet and condensed consolidated financial statements were presented "in accordance with accounting principles generally accepted in the United States of America ('GAAP')." Bird further stated that it accounted for Sharing Revenue "as operating lease revenue pursuant to ASC 840, Leases, and records revenue upon completion of each ride."

174.202.    The preceding statements in Bird's October Prospectus relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

**K.    October 2021 Soliciting Material**

203.    On October 7, 2021, Bird and Switchback issued a press release entitled "Bird Global and Switchback II Corporation Announces November 2, 2021 Extraordinary General Meeting Date to Approve Proposed Business Combination." The document was deemed solicitation materials filed pursuant to Rule 14a-12 under the Securities Exchange Act of 1934.

- 73 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

204. In the October 2021 Soliciting Material quotes Defendant VanderZanden as touting Bird's first half 2021 performance and continued progress against its strategic initiatives:

> *Following our outperformance in the first half of this year and continued progress against our strategic initiatives, Bird is well positioned to deliver on our objectives with a clear focus on profitability.* As we look ahead, we intend to build upon our market leadership and grow our business, which currently only scratches the surface of the estimated $800 billion annual market opportunity for micromobility, said Bird Founder and CEO, Travis VanderZanden.

205. The October 2021 Soliciting Material also quotes Defendants Mutrie and McNeill as emphasizing Bird's management's demonstrated execution excellence since inception and Bird's continuing to deliver strong operating and financial results:

> Jim Mutrie and Scott McNeill, Co-Chief Executive Officers and Directors of Switchback II, commented, "We are proud to help bring Bird to the public markets and strongly believe in the company's mission to provide environmentally friendly transportation for everyone. *Travis and the Bird team have demonstrated execution excellence since inception and continue to deliver strong operating and financial results in this expansive market.* We look forward to our continued partnership with Bird as it enters its next chapter.

206. The Soliciting Material then provides recent business highlights and Milestones for Bird:

> **Recent Business Highlights and Milestones**
>
> As previously reported on August 19, 2021, Bird's second quarter financial performance for the three-month period ended June 30, 2021 significantly exceeded Bird's expectations. Results included:
>
> - Revenue of $60.0 million, 36% above expectations, representing a year-over-year increase of 477% versus the same period in 2020, and a 43% increase versus the same period in 2019.

- 74 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Gross margin of 26% as a percentage of revenue, representing an 85 percentage point increase over the prior year period.

- Ride Profit Margin (before Vehicle Depreciation) as a percentage of sharing revenue of 49%, compared to 15% for the prior year period and outperforming expectations by 13 percentage points.

- Net loss of $43.7 million versus a net loss of $50.0 million in the prior year period. Adjusted EBITDA loss of $11.5 million, an improvement of 73% year-over-year, exceeding expectations by 48%.

207. The preceding statements in the Soliciting Materials were materially false and misleading and omitted to disclose material facts. Unbeknownst to investors, for the three month ended June 30, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded. Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue. As noted above, Bird's 2Q 2021 total revenue was only $55,654,000 ($4,390,000 less than initially reported). Consequently, the cited gross margin, gross profit, ride profit margin, and net loss metrics dependent upon this Sharing Revenue figure were also misstated. Finally, these misrepresented and omitted facts render Defendants VanderZanden, Mutrie and McNeill's positive statements concerning Bird's outperformance, execution excellence and operating and financial results false and misleading.

**L.    October 2021 Definitive Proxy Statement**

**1.    False and Misleading Financial Metrics**

**I.A.    October 2021 Definitive Proxy Statement**

**1.    False and Misleading Financial Metrics**

208.  Also on October 7, 2021, Switchback filed with the SEC a definitive proxy statement on Schedule 14(a), which ) for the solicitation of proxies in

- 75 -

connection with an extraordinary general meeting of Switchback's shareholders to be held on November 2, 2021 to consider and vote on, among other proposals, proposals to approve the Merger. The Proxy was signed by Defendant Mutrie. It incorporated Bird's financial statements and the The Proxy included information about Bird provided by Defendants VanderZanden and Ling, including a summary historical financial data of Bird, management discussion and analysis of those financial statementsfinancial condition and results of operations of Bird, a letter from Bird's founder signed by Defendant VanderZanden. The Proxy included information provided by Switchback's Board, including their recommendation that Switchback's shareholders vote "FOR" the approval of the Business Combination Proposals and a description of the reasons for the approval of the Business Combination and the recommendation of the Switchback Board.

175.209.    All Defendants reviewed, prepared and had ultimate authority over the contents of the Proxy. All Defendants solicited or permitted his or her name to be used in the Proxy.

176.210.    That proxy statement claimed, among other things, FY 2020 total revenue of $94,601,000, sharing revenue of $79,941,000, gross margin of negative $23,534,000, and net loss of $208,230,000.

177.211.    That proxy statement also claimed, among other things, 1H 2021 total revenue of $85,714,000, Sharing Revenue of $78,287,000, gross margin of $17,779,000, and net loss of $119,886,000.

178.212.    The preceding statements in the proxy statement relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2020, and the six months ended June 30, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded

- 76 -

"wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b) Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i) Bird's 2020 Sharing Revenue was only $75,445,000 ($4,496,000 less than initially reported);

(ii) Bird's 2020 total revenue was only $90,105,000 ($4,496,000 less than initially reported);

(iii) Bird's 2020 gross margin was negative $25,887,000 (a $2,353,000 greater loss than initially reported); and

(iv) Bird's 2020 net loss was $208,733,000 (a $503,000 greater loss than reported).

**2.     False and Misleading Statements of GAAP Compliance**

179.213.     In the proxy statement, Bird stated, "Our revenue is primarily generated from our Sharing business. Customers typically pay for the ride from their preloaded wallet balances on a per-ride basis, and ***revenue is generally recognized at the time of the ride***."

180.214.     In the proxy statement, Defendants stated that its balance sheet and condensed consolidated financial statements were presented "in accordance with United States generally accepted accounting principles ('GAAP')." Bird further stated, "The Company accounts for [Sharing Revenue] as operating lease revenue pursuant to ASC 840, Leases, and records revenue upon completion of each ride," and that it was "in the process of evaluating [the] impact" of ASC 842, a new accounting standard for recognizing lease revenue that replaced ASC 840.

- 77 -

181.215.   The preceding statements in the Proxy Statement relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

### 3.   False and Misleading Identified Drivers for Financial Results

182.216.   Defendants also stated in the Proxy Statement, "Sharing revenue increased by $52.5 million, or 204.1%, from $25.7 million in the six months ended June 30, 2020, to $78.3 million in the six months ended June 30, 2021. *The increase was primarily due to a 153.4% increase in the number of Rides, as well as an increase in revenue per Ride*."

183.217.   The preceding statement is false and misleading because Sharing Revenue, and other financial figures that rely on Sharing Revenue, were less than Bird stated. Further, the claims that Bird's financial performance was driven by its increase in number of rides and increase in revenue per ride are false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

### J.M.   3Q 2021 Reported Financial Results (November 15, 2021)

### 1.   False and Misleading Financial Metrics in Form 8-K

184.218.   Bird filed a Form 8-K on November 15, 2021, announcing its financial results for the three and nine months ended September 30, 2021. It was signed by Defendant Ling. In an accompanying press release, Bird reported, among other things, quarterly Sharing Revenue of $64,027,000, total revenue of $65,406,000, a gross margin of $13,463,000, a net loss of $36,868,000, a net loss of $0.72 per basic and diluted common share, and adjusted EBITDA of negative $5,300,000.

- 78 -

185.219.    Bird also reported financials for the nine months ended September 30, 2021. Bird reported YTD 2021 Sharing Revenue of $142,314,000, total revenue of $151,120,000, deferred revenue of $45,332,000, a gross margin of $31,242,000, a net loss of $156,754,000, a net loss of $3.04 per basic and diluted common share, and adjusted EBITDA of $28,000,000.

186.220.    The preceding statements in the Form 8-K relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's 3Q 2021 Sharing Revenue was only $59,729,000 ($4,298,000 less than initially reported);

(ii)    Bird's 3Q 2021 total revenue was only $61,108,000 ($4,298,000 less than initially reported);

(iii)    Bird's 3Q 2021 gross margin was only $8,222,000 ($5,241,000 less than initially reported);

(iv)    Bird's 3Q 2021 net loss was $42,109,000 (a $5,241,000 greater loss than initially reported);

- 79 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

(v)    Bird's 3Q 2021 net loss per basic and diluted common share was revised from $0.82 to $0.92 (a drop of $0.10 per share);[9]

(vi)    Bird's YTD 2021 Sharing Revenue was only $132,202,000 ($10,112,000 less than initially reported);

(vii)    Bird's YTD 2021 total revenue was only $141,008,000 ($10,112,000 less than initially reported);

(viii)    Bird's deferred revenue was $59,940,000 ($14,608,000 more than initially reported);

(ix)    Bird's YTD 2021 gross margin was only $18,987,000 ($12,255,000 less than initially reported);

(x)    Bird's YTD 2021 net loss was $168,198,000 (a $11,444,000 greater loss than initially reported); and

(xi)    Bird's YTD 2021 net loss per basic and diluted common share was revised from $3.46 to $3.69 (a drop of $0.23 per share).[10]

## 2.    False and Misleading Identified Drivers for Financial Results

~~187.~~221.    In the press release attached to Bird's Form 8-K, Defendant VanderZanden, the Founder and CEO of Bird, stated, "Our third quarter results illustrate how we continue to capitalize on robust consumer demand and further our path to profitability driven by strong execution and compelling unit economics."

~~188.~~222.    In that same press release, Defendant Ling, CFO of Bird, stated, "We have exceeded our expectations year-to-date for revenue, gross margin, Ride Profit, and Adjusted EBITDA. Our world class operations team has continued to

---

[9] The Company explained the discrepancy between (i) the loss per share as originally reported in November- 2021 and (ii) the loss per share listed as previously reported in the 10-K/A by stating that "[w]eighted-average shares [were]retroactively restated to give effect to the Business Combination."

[10] The Company gave the same explanation for the discrepancy in YTD loss per share as it did for quarterly loss per share compared to the numbers originally reported in November- 2021.

- 80 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

consistently deliver Ride Profit Margins (before Vehicle Depreciation) improvement, with 47% Ride Profit Margins over the last twelve months despite continued COVID-19 headwinds and global supply chain constraints. This performance gives us confidence to increase our revenue and Adjusted EBITDA expectations for full year 2021."

189.223.    In the Form 10-Q, providing a comparison of its revenues for 3Q 2021 compared to the same period the year earlier, Bird again reported its false Sharing Revenue, gross margin, and net loss figures as enumerated above. Bird stated, "*Sharing revenue increased by $30.4 million, or 90.7%, for the three months ended September 30, 2021, compared to the same period last year. The increase in sharing revenue was primarily driven by an increase in the number of Rides (defined below)*."

190.224.    Then Bird compared its revenues for YTD 2021 against the same period in 2020, repeating its false Sharing Revenue, gross margin, and net loss figures as enumerated above. Bird stated, "*Sharing revenue increased by $83.0 million, or 139.9%, for the nine months ended September 30, 2021, compared to the same period last year. The increase in sharing revenue was primarily driven by an increase in the number of Rides (defined below), as well as an increase in fares*."

191.225.    The preceding statements are false and misleading because Sharing Revenue, and other financial figures that rely on Sharing Revenue, were less than Bird stated. Further, the claims that Bird's financial performance was driven by its capitalization on robust consumer demand, strong execution, compelling unit economics, and operations team are false and misleading because Bird omits the material fact that $4.3 million of the $30.4 million claimed increased year-over-year quarterly Sharing Revenue (i.e., over 14%), and $10.1 million of the $83.0 million claimed increased year-over-year year-to-date Sharing Revenue (i.e., over 12%), is explained by Bird's false and misleading overstatement of its Sharing Revenue.

- 81 -

### 3.    False and Misleading Financial Metrics in Form 10-Q

192.226.    That same day, Bird filed its first Form 10-Q as a public company with the SEC, for the quarter ended September 30, 2021 ("3Q 2021 10-Q"). It was signed by Defendants VanderZanden and Ling. Bird reported, among other things, quarterly Sharing Revenue of $64,027,000, total revenue of $65,406,000, a gross margin of $13,463,000, a net loss of $36,868,000, a net loss of $0.72 per basic and diluted common share, and adjusted EBITDA of negative $5,300,000.

193.227.    Bird also reported financials for the nine months ended September 30, 2021. Bird reported YTD 2021 Sharing Revenue of $142,314,000, total revenue of $151,120,000, deferred revenue of $45,332,000, a gross margin of $31,242,000, a net loss of $156,754,000, a net loss of $3.04 per basic and diluted common share, and adjusted EBITDA of $28,000,000.

194.228.    The preceding statements in the 3Q 2021 10-Q relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's 3Q 2021 Sharing Revenue was only $59,729,000 ($4,298,000 less than initially reported);

(ii)    Bird's 3Q 2021 total revenue was only $61,108,000 ($4,298,000 less than initially reported);

- 82 -

(iii)   Bird's 3Q 2021 gross margin was only $8,222,000 ($5,241,000 less than initially reported);

(iv)   Bird's 3Q 2021 net loss was $42,109,000 (a $5,241,000 greater loss than initially reported);

(v)   Bird's 3Q 2021 net loss per basic and diluted common share was revised from $0.82 to $0.92 (a drop of $0.10 per share);[11]

(vi)   Bird's YTD 2021 Sharing Revenue was only $132,202,000 ($10,112,000 less than initially reported);

(vii)   Bird's YTD 2021 total revenue was only $141,008,000 ($10,112,000 less than initially reported);

(viii)   Bird's deferred revenue was $59,940,000 ($14,608,000 more than initially reported);

(ix)   Bird's YTD 2021 gross margin was only $18,987,000 ($12,255,000 less than initially reported);

(x)   Bird's YTD 2021 net loss was $168,198,000 (a $11,444,000 greater loss than initially reported); and

(xi)   Bird's YTD 2021 net loss per basic and diluted common share was revised from $3.46 to $3.69 (a drop of $0.23 per share).[12]

**4.   False and Misleading Statements of GAAP Compliance**

~~195.~~229.   The 3Q 2021 10-Q stated that Bird's balance sheet and condensed consolidated financial statements were presented "in accordance with accounting principles generally accepted in the United States of America ('GAAP')." Bird

---

[11] The Company explained the discrepancy between (i) the loss per share as originally reported in November 2021 and (ii) the loss per share listed as previously reported in the 10-K/A by stating that "[w]eighted-average shares [were] retroactively restated to give effect to the Business Combination."

[12] The Company gave the same explanation for the discrepancy in YTD loss per share as it did for quarterly loss per share compared to the numbers originally reported in November 2021.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

further stated that it was "in the process of evaluating [the] impact" of ASC 842, a new accounting standard for recognizing lease revenue that replaced ASC 840.

196.230.    The 3Q 2021 10-Q stated, "Our revenue is primarily generated from our Sharing business. Customers typically pay for the ride from their preloaded wallet balance on a per-ride basis, and revenue is typically recognized at the time of the ride."

197.231.    The preceding statements relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

### 5.    False and Misleading Internal Control and Sarbanes-Oxley Certifications

198.232.    Attached to the 3Q 2021 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants VanderZanden and Ling attesting to the accuracy of financial reporting, the disclosure of any material changes to Bird's internal control over financial reporting, and the disclosure of all fraud.

199.233.    In the 3Q 2021 10-Q, Bird stated that it had identified material weaknesses in its disclosure controls and procedures such that they "were not effective at the reasonable assurance level" as of September 30, 2021. Bird "determined that material weaknesses existed in Bird's internal control over financial reporting due to (i) ineffective controls to evaluate and review the accounting for equity and loss per share and (ii) limited accounting department personnel capable of appropriately accounting for complex transactions undertaken by Bird."

200.234.    The foregoing statements were misleading for failing to mention any material weakness in its internal control relating to its overstatement of Sharing Revenues. As Bird acknowledged in the November 18, 2022 Form 10-K/A filed in connection with Bird's restatement of its financial statements, there was "a material weakness in our internal control over financial reporting as of December 31, 2021

- 84 -

and 2020 related to the ineffective design of controls around our business systems and the lack of a review control to detect that our business systems failed to constrain revenue that resulted in the recording of revenue for uncollectible balances following the completion of certain Rides that should not have been recorded."

**6.     False and Misleading Statements on November 15, 2021, Q3 2021 Earnings Conference Call**

201.235.     Bird held a conference call on the same day that it released its 3Q 2021 10-Q to discuss its earnings. In his prepared remarks, Defendant VanderZanden stated:

> *We delivered $65.4 million in revenue for the quarter, representing 63% revenue growth versus last year, combined with significant gross margin expansion, which drove improved Adjusted EBITDA. Underlying this performance was strengthening demand across regions, continued benefits from the roll out of our new Bird Three, growth in our long-tail markets, and continued strength from our Fleet Manager program. We reported $79.5 million in Gross Transaction Value, representing a 60% increase compared to last year, while Ride Profit Margin before Vehicle Depreciation as a percentage of sharing revenue was 50%.*

202.236.     In his prepared remarks, Defendant Ling added:

> *For the third quarter, we reported GTV of $79.5 million, up 60% year-over-year. This reflects continued progress on expanding our deployed vehicle fleet coupled with strong utilization as COVID trends normalize.*
>
> *           *           *
>
> *Gross margin was positive $13.5 million, buoyed by a mix shift towards newer generation vehicles, compared to approximately positive $900 thousand in Q3 2020. Ride Profit Margin before vehicle depreciation increased to 50%, compared to 43% in the prior year period, on the back of increased ride utilization coupled with optimizations to our Fleet Manager revenue share structure in the US business. We are very pleased with the consistent improvement in margins, which is a reflection of the improvements in vehicle unit economics coupled*

- 85 -

*with our novel Fleet Manager operating model. Over the past four quarters, Ride Profit Margin before vehicle depreciation has remained consistently over 40%[.]*

\*     \*     \*

*We reported an Adjusted EBITDA loss of $5.3 million in the third quarter, representing an improvement of $22.7 million compared to the prior year period, reflecting higher ride utilization, strong ride profit margins, and well controlled operating expenses, partially offset by delays in product sales timing and global supply chain issues restricting deployed vehicle supply. Our third quarter results reflect continued momentum from our strong first half performance leading to year to date revenue growth of 114%, GTV growth of 112%, and Adjusted EBITDA improvement of $102 million compared to the prior year nine-month period.*

\*     \*     \*

For fiscal 2021 we now expect revenue to be between $195 million and $205 million, compared to our original expectation of $188 million. And we expect Adjusted EBITDA to be between a loss of $(85) million and $(75) million, compared to our original expectation of a loss of $(96) million. This increased outlook reflects higher than expected ride utilization, partially offset by global supply chain disruption on both our sharing and product sales businesses. *We have exceeded our expectations year-to-date, with outperformance across revenue, gross margin, Ride Profit, and Adjusted EBITDA and we are pleased to be able to raise our fiscal 2021 outlook.*

237.   These statements from the November 15, 2021 earnings call are false and misleading because:

(a)   All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

- 86 -

011147 11/2321628 V1Compare Result 7 12/18/2023

(b)    All financial information that depends on revenue, including revenue growth, gross margin, and adjusted EBITDA, is false and misleading because it depends on false and misleading information as an input.

(c)    The claim that Bird's financial performance was driven by strengthening demand, new scooters, growth in long-tail markets, efficiencies in the Fleet Manager model, or improved utilization is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

### K.N.  December 1, 2021, Credit Suisse Technology Conference

204.238.    On December 1, 2021, Bird presented at the Credit Suisse Technology Conference. Travis VanderZanden, Bird's President, CEO, and Director, represented Bird at the conference.

205.239.    In his prepared remarks, Defendant VanderZanden stated:

> *Average ride profit margins of about 47% over the last 12 months.*
>
> *         *         *
>
> *And so, really if you look at the last 12 months*, right, so you can see kind of the seasonality baked into that fully, *ride profit was positive 47% and ride profit after vehicle depreciation, which again is pretty close proxy to gross margin was positive 21% over the full 12-month period*, including the seasonality period.
>
> *         *         *
>
> *Real quick, we did announce our Q3 earnings recently, so I thought I'd cover that quickly. We did $65 million in revenue. Adjusted EBITDA was negative $5 million, which is something we're very, very proud of and excited about.*

206.240.    These statements from the December 1, 2021, investor presentation are false and misleading because:

- 87 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including ride profit margin, gross margin, and adjusted EBITDA, is false and misleading because it depends on false and misleading information as an input.

**L.O.    Q4 and FY 2021 Reported Financial Results (March 15, 2022)**

**1.    False and Misleading Financial Metrics in Form 8-K**

207.241.    Bird filed an 8-K on March 15, 2022, announcing its financial results for the fourth quarter and fiscal year ended December 31, 2021. It was signed by Defendant Ling. In an accompanying press release, Bird reported, among other things, 2021 Sharing Revenue of $187,327,000, total revenue of $205,142,000, deferred revenue of $43,345,000, a gross margin of $39,406,000, a net loss of $196,333,000, a net loss of $2.51 per basic and diluted common share, and an adjusted EBITDA of negative $66,900,000.

208.242.    Bird also reported its financials for the three months ended December 31, 2021. Bird reported, among other things, 4Q 2021 Sharing Revenue of $45,013,000, total revenue of $54,022,000, a gross margin of $8,164,000, a net loss of $39,579,000, and a net loss of $0.22 per basic and diluted common share.

209.243.    The preceding statements in the Form 8-K and 2021 Form 10-K relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the year ended December 31, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

- 88 -

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's Q4 2021 Sharing Revenue was only $40,527,000 ($4,486,000 less than initially reported);

(ii)    Bird's Q4 2021 total revenue was only $49,536,000 ($4,486,000 less than originally reported);

(iii)    Bird's Q4 2021 gross margin was only $3,678,000 ($4,486,000 less than initially reported);

(iv)    Bird's Q4 2021 net loss was $46,726,000 (a $7,147,000 greater loss than initially reported);

(v)    Bird's Q4 2021 net loss per basic and diluted common share was revised from $0.22 to $0.26 (a drop of $0.04 per share);

(vi)    Bird's FY 2021 Sharing Revenue was only $172,729,000 ($14,598,000 less than initially reported);

(vii)    Bird's FY 2021 total revenue was only $190,544,000 ($14,598,000 less than initially reported);

(viii)    Bird's deferred revenue was $62,439,000 ($19,094,000 more than initially reported);

(ix)    Bird's FY 2021 gross margin was only $22,665,000 ($16,741,000 less than initially reported);

(x)    Bird's FY 2021 net loss was $214,924,000 (a $18,591,000 greater loss than initially reported);

(xi)    Bird's FY 2021 net loss per basic and diluted common share was revised from $2.51 to $2.74 (a drop of $0.23 per share); and

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

(xii) Bird's FY 2021 adjusted EBITDA was negative $80.9 million ($14 million worse than originally reported).

(c)    By overstating its Sharing Revenue in its 2021 Form 10-K, Bird falsely and misleadingly made it appear as though it *beat* its guidance ($205.1 million in revenue against guidance of $195 million to $205 million). But that was a lie. In truth, Bird *missed* its guidance, with revenue of $190.5 million.

## 2.    False and Misleading Identified Drivers for Financial Results

210.244.    In the press release attached to Bird's Form 8-K, Defendant VanderZanden, the Founder and CEO of Bird, stated, "We are very pleased with our strong finish to fiscal 2021. ***We exceeded our increased expectations for the year by capitalizing on the momentum driven by easing pandemic-related restrictions and continued adoption of micromobility by people and cities across the globe***. During the fourth quarter, Rides increased over 100% year-over-year despite macro-related headwinds including the surge in Omicron cases late in the period."

211.245.    In that same press release, Defendant Ling, CFO of Bird, stated, "Our fiscal 2021 results demonstrate the strength of our model and our continued focus on profitability as we delivered Adjusted EBITDA above our expectations, driven in part by significant margin improvement. Our Ride Profit Margin (before Vehicle Depreciation) increased to 49% in 2021 from 20% in 2020. We also reported our first full year of positive gross margin, which was also positive in each quarter, translating to a 44 percentage point increase as a percentage of revenue year-over-year. We expect to see continued margin improvement despite ongoing macro headwinds as the effectiveness of our Fleet Manager operating model and durability of our Bird-designed vehicles continue to prove successful."

212.246.    In providing a comparison of its revenues for FY 2021 compared to the year earlier, Bird again reported its false Sharing Revenue, gross margin, and net loss figures as enumerated above. Bird stated, "***Sharing revenue increased by***

- 90 -

*$107.4 million in 2021, or 134.3%, as compared to the previous year, primarily attributable to an increase in the number of Rides (as defined below).*"

~~213.~~247.    The preceding statements are false and misleading because Sharing Revenue, and other financial figures that rely on Sharing Revenue, were less than Bird stated. Further, the claims that Bird's financial performance was driven by its capitalization on momentum, the easing of pandemic-related restrictions, continued adoption of micromobility across the globe, the strength of Bird's model, its continued focus on profitability, the effectiveness of its operating model, and durability of its vehicles are false and misleading because Bird omits the material fact that $14.6 million of the $107.4 million claimed increased annual Sharing Revenue (i.e., over 13%) is explained by Bird's false and misleading overstatement of its Sharing Revenue.

### 3.    False and Misleading Financial Metrics in Form 10-K

~~214.~~248.    That same day, the Company filed its 2021 Form 10-K with the SEC. It was signed by Defendants VanderZanden and Ling. The 2021 Form 10-K reported, among other things, 2021 Sharing Revenue of $187,327,000, total revenue of $205,142,000, deferred revenue of $43,345,000, a gross margin of $39,406,000, a net loss of $196,333,000, a net loss of $2.51 per basic and diluted common share, and an adjusted EBITDA of negative $66,900,000.

~~215.~~249.    The 2021 Form 10-K also reported its financials for the three months ended December 31, 2021. Bird reported, among other things, 4Q 2021 Sharing Revenue of $45,013,000, total revenue of $54,022,000, a gross margin of $8,164,000, a net loss of $39,579,000, and a net loss of $0.22 per basic and diluted common share.

~~216.~~250.    The preceding statements in the 2021 Form 10-K relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

- 91 -

(a)     Unbeknownst to investors, for the year ended December 31, 2021, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)     Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)     Bird's Q4 2021 Sharing Revenue was only $40,527,000 ($4,486,000 less than initially reported);

(ii)     Bird's Q4 2021 total revenue was only $49,536,000 ($4,486,000 less than originally reported);

(iii)     Bird's Q4 2021 gross margin was only $3,678,000 ($4,486,000 less than initially reported);

(iv)     Bird's Q4 2021 net loss was $46,726,000 (a $7,147,000 greater loss than initially reported);

(v)     Bird's Q4 2021 net loss per basic and diluted common share was revised from $0.22 to $0.26 (a drop of $0.04 per share);

(vi)     Bird's FY 2021 Sharing Revenue was only $172,729,000 ($14,598,000 less than initially reported);

(vii)     Bird's FY 2021 total revenue was only $190,544,000 ($14,598,000 less than initially reported);

(viii)     Bird's deferred revenue was $62,439,000 ($19,094,000 more than initially reported);

(ix)     Bird's FY 2021 gross margin was only $22,665,000 ($16,741,000 less than initially reported);

- 92 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(x)    Bird's FY 2021 net loss was $214,924,000 (a $18,591,000 greater loss than initially reported);

(xi)    Bird's FY 2021 net loss per basic and diluted common share was revised from $2.51 to $2.74 (a drop of $0.23 per share); and

(xii)    Bird's FY 2021 adjusted EBITDA was negative $80.9 million ($14 million worse than originally reported).

(c)    By overstating its Sharing Revenue in its 2021 Form 10-K, Bird falsely and misleadingly made it appear as though it *beat* its guidance ($205.1 million in revenue against guidance of $195 million to $205 million). But that was a lie. In truth, Bird *missed* its guidance, with revenue of $190.5 million.

### 4.    False and Misleading Statements of GAAP Compliance

~~217.~~251.    The 2021 Form 10-K stated that Bird's balance sheet and condensed consolidated financial statements were "prepared in accordance with GAAP." The 2021 Form 10-K further stated that Bird was "in the process of evaluating [the] impact" of ASC 842, a new accounting standard for recognizing lease revenue that replaced ASC 840.

~~218.~~252.    The 2021 10-K stated, "Our revenue is primarily generated from our Sharing business. Customers typically pay for the ride from their preloaded wallet balance on a per-ride basis, and revenue is typically recognized at the time of the ride."

~~219.~~253.    The preceding statements relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

### 5.    False and Misleading Internal Control and Sarbanes-Oxley Certifications

~~220.~~254.    Attached to the 2021 Form 10-K were Sarbanes-Oxley certifications signed by Defendants VanderZanden and Ling attesting to the accuracy

- 93 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of financial reporting, the disclosure of any material changes to Bird's internal control over financial reporting, and the disclosure of all fraud.

221.255.    The 2021 Form 10-K stated that it had "concluded that, as of December 31, 2021, [its] *disclosure controls and procedures were effective at the reasonable assurance level*."

222.256.    The 2021 Form 10-K also discussed Bird's remediation of material weaknesses "related to the previously reported material weaknesses in internal control over financial reporting."

223.257.    These statements were false and/or misleading because they omitted any mention of the material weakness in its internal control relating to its overstatement of Sharing Revenues. As Bird acknowledged in the November 18, 2022, Form 10-K/A filed in connection with Bird's restatement of its financial statements, there was "a material weakness in our internal control over financial reporting as of December 31, 2021 and 2020 related to the ineffective design of controls around our business systems and the lack of a review control to detect that our business systems failed to constrain revenue that resulted in the recording of revenue for uncollectible balances following the completion of certain Rides that should not have been recorded."

### 6. False and Misleading Statements on March 15, 2022, FY 2021 Earnings Conference Call

224.258.    Bird held a conference call on the same day that it released its 2021 Form 10-K to discuss its earnings. In his prepared remarks, Defendant VanderZanden stated:

> *Fourth quarter revenue was $54 million, representing year-over-year growth of 126%. And our quarterly ride profit margin before vehicle depreciation reached an all-time high of 53%* despite macro-related headwinds from the surge in Omicron cases later in the period and disruption of the global supply chain. . . . *A number of significant milestones were achieved in 2021, most notably, one, the delivery of $205 million in revenue in*

- 94 -

*our fourth year of operation, in line with the top end of our guidance and representing a 117% growth compared to the prior year; along with gross margin of 19% for the year, including four consecutive quarters of positive gross margin, culminating in record adjusted EBITDA performance ahead of expectation.*

225.259.    In his own prepared remarks, Defendant Yibo Ling stated:

*We delivered revenue of $205 million, achieving the high end of our guidance range, while adjusted EBITDA loss of $67 million exceeded the high end of our guidance by 10%. Underlying this performance was continued strength in gross margin, driven by our Fleet Manager operating model and continued vehicle innovation.*

*For the quarter, we reported revenue of $54 million, up 126% against Q4 2020. Our Sharing business outperformed our expectations, driven primarily by a strong improvement in utilization as measured by rides per deployed vehicle per day.*

*Gross margin for the fourth quarter was positive $8 million compared to negative $2 million in Q4 2020. Ride profit before vehicle depreciation as a percentage of Sharing revenue increased to 53%. And finally, we reported an adjusted EBITDA loss of $21 million in the fourth quarter, reflecting an improvement of $7 million compared to the prior-year period.*

226.260.    Defendant Ling doubled down on his stated reasons for financial growth in response to a question from an analyst:

Question – Steven B. Fox: Okay. Thanks. And then on the unit economics, the ride margin ex-depreciation, it's really fabulous especially given the quarter you were in, but I'm having trouble getting to the math. Can you sort of break down the improvement either year-over-year or quarter-over-quarter? What contributed to the – as you can in terms of how you get to that number? Thanks.

Answer – Yibo Ling: It's a great question, Steven. *So, ride margin, the story there, which we, by the way, expect to enjoy further fruits of in the coming years, is really driven by strong performance that we've seen with our fleet managers in combination with their earnings and the retention that result from that.* So, as the fleet managers

- 95 -

do well, that helps us in a meaningful way with the ride margin and excluding depreciation point. For the year ahead, as utilization continues to recover, that piece of the story should continue to come to the fore and driving continued progression on ride margin.

227.261.    These statements from the March 15, 2022, earnings call are false and misleading.

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including earnings growth, ride profit margin, gross margin, and adjusted EBITDA, is false and misleading because it depends on false and misleading information as an input.

(c)    The claims that Bird's financial performance was driven by its operating model, innovation, and improvements in rides per deployed vehicle per day are false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

**M.P.  1Q 2022 Financial Results (May- 16, 2022)**

**1.    False and Misleading Financial Metrics in 8-K**

228.262.    Bird filed a Form 8-K on May- 16, 2022, announcing its financial results for the three months ended March- 31, 2022. It was signed by Defendant Ling. In an accompanying press release, Bird reported, among other things, quarterly Sharing Revenue of $33,577,000, total revenue of $37,978,000, deferred revenue of $42,757,000, a gross margin of $3,423,000, net income of $10,351,000, a net profit of $0.04 per basic and diluted common share, and adjusted EBITDA of negative $36.8- million.

- 96 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

229.263.    The Form 8-K began with a quote from Defendant VanderZanden, crowing that Bird had exceeded its 1Q 2022 revenue guidance range ($38.0 million versus guidance of $34.0 million to $36.0 million): "***Our first quarter revenue performance exceeded our guided range***."

230.264.    The preceding statements in the Form 8-K relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the three months ended March 31, 2022, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's Q1 2022 Sharing Revenue was only $30,974,000 ($2,603,000 less than initially reported);

(ii)    Bird's Q1 2022 total revenue was only $35,375,000 ($2,603,000 less than originally reported);

(iii)    Bird's deferred revenue was $64,454,000 ($21,697,000 more than originally reported);

(iv)    Bird's Q1 2022 gross margin was only $820,000 ($2,603,000 less than initially reported);

(v)    Bird's Q1 2022 net income was $7,748,000 ($2,603,000 less than initially reported);

- 97 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

(vi)    Bird's Q1 2022 net profit per basic and diluted common share was revised from $0.04 to $0.03 (a drop of $0.01 per share); and

(vii)    Bird's Q1 2022 adjusted EBITDA was negative $39.4 million ($2.6 million less than originally reported).

(c)    Bird did *not* exceed its guidance range of $34 million to $36 million in total quarterly revenue. In truth, Bird's quarterly revenue was $35.4 million, within its guided range.

**2.    False and Misleading Identified Drivers for Financial Results**

231.265.    In Bird's Form 8-K announcing its first quarter financials, Defendant VanderZanden stated that Bird's performance was "driven by continued demand recovery into the end of the period and a strong foundation of leading technology and Fleet Manager operating model efficiencies."

232.266.    In the same Form 8-K, Defendant Ling stated, "Over the past two years we have refined our operating model and focused on improving unit economics evidence by average gross margins of 14% over the last seven quarters and Ride Profit Margins at or above 35% over the same period."

233.267.    In providing a comparison of its revenues for 1Q 2022 compared to the year earlier, Bird again reported its false Sharing Revenue, gross margin, and net loss figures as enumerated above. Bird stated, "***Sharing revenue increased by $11.9 million, or 55.1%, for the three months ended March 31, 2022, as compared to the same period last year. The increase was primarily driven by an increase in the number of Rides (defined below)***."

234.268.    The preceding statements are false and misleading because Sharing Revenue, and other financial figures that rely on Sharing Revenue, was less than Bird stated. Further, the claims that Bird's financial performance was driven by continued demand recovery, leading technology, operating model efficiencies, and unit economics are false and misleading because Bird omits the material fact that

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

$2.6— million of the $11.9— million claimed increased year-over-year quarterly Sharing Revenue (i.e., almost 22%) is explained by Bird's false and misleading overstatement of its Sharing Revenue.

**3.    False and Misleading Financial Metrics in Form 10-Q**

235.269.    That same day, Bird filed its 1Q 2022 Form 10-Q with the SEC. It was signed by Defendants Ling and VanderZanden. The 1Q 2022 Form 10-Q reported, among other things, quarterly Sharing Revenue of $33,577,000, total revenue of $37,978,000, deferred revenue of $42,757,000, a gross margin of $3,423,000, net income of $10,351,000, a net profit of $0.04 per basic and diluted common share, and adjusted EBITDA of negative $36.8— million.

236.270.    The preceding statements in the 1Q 2022 Form 10-Q relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(a)    Unbeknownst to investors, for the three months ended March- 31, 2022, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's Q1 2022 Sharing Revenue was only $30,974,000 ($2,603,000 less than initially reported);

(ii)    Bird's Q1 2022 total revenue was only $35,375,000 ($2,603,000 less than originally reported);

- 99 -

(iii)    Bird's deferred revenue was $64,454,000 ($21,697,000 more than originally reported);

(iv)    Bird's Q1 2022 gross margin was only $820,000 ($2,603,000 less than initially reported);

(v)    Bird's Q1 2022 net income was $7,748,000 ($2,603,000 less than initially reported);

(vi)    Bird's Q1 2022 net profit per basic and diluted common share was revised from $0.04 to $0.03 (a drop of $0.01 per share); and

(vii)    Bird's Q1 2022 adjusted EBITDA was negative $39.4 million ($2.6 million less than originally reported).

(c)    Bird did *not* exceed its guidance range of $34 million to $36 million in total quarterly revenue. In truth, Bird's quarterly revenue was $35.4 million, within its guided range.

### 4.    False and Misleading Statements of GAAP Compliance

237.271.    The 1Q 2022 Form 10-Q stated that Bird's balance sheet and condensed consolidated financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP')." The 1Q 2022 Form 10-Q further stated that although Bird was "continuing to assess the potential impacts of" implementing ASC 842, "it [did] not expect it to have a material effect on its consolidated financial statements."

238.272.    The 1Q 2022 Form 10-Q stated, "Our revenue is primarily generated from our Sharing business. *Customers generally pay for rides from their preloaded wallet balances on a per-ride basis, and revenue is typically recognized at the completion of the ride*."

239.273.    The preceding statements relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird

- 100 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

### 5. False and Misleading Internal Control and Sarbanes-Oxley Certifications

240.274.    Attached to the 1Q 2022 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants VanderZanden and Ling attesting to the accuracy of financial reporting, the disclosure of any material changes to Bird's internal control over financial reporting, and the disclosure of all fraud.

241.275.    In its 1Q 2022 Form 10-Q, Bird stated that it had "concluded that, as of [March 31, 2022, its] *disclosure controls and procedures were effective at the reasonable assurance level*."

242.276.    This statement was false and/or misleading. Bird omitted any mention of the material weakness in its internal control relating to its overstatement of Sharing Revenues. As Bird acknowledged in a November 18, 2022 Form 10-Q/A filed in connection with Bird's restatement of its financial statements, there was "a material weakness in our internal control over financial reporting as of December 31, 2021 and 2020 and March 31, 2022 related to the ineffective design of controls around our business systems and the lack of a review control to detect that our business systems failed to constrain revenue that resulted in the recording of revenue for uncollectible balances following the completion of certain Rides that should not have been recorded."

### 6. False and Misleading Statements on May 16, 2022, Q1 2022 Earnings Conference Call

243.277.    Bird held a conference call on the same day that it released its 1Q 2022 Form 10-Q to discuss its earnings. In his prepared remarks, Defendant VanderZanden stated:

> *In Q1, revenue grew by 48% year-over-year and exceeded our guidance range, driven by continued demand improvement into the end of March alongside expanding*

- 101 -

*vehicle deployments*. As we noted on our last call, performance early in the quarter was impacted by weather and the surge in Omicron cases, *but we saw a significant increase in demand beginning in early March as macro headwinds eased, weather improved, and consumers turned to transportation alternatives such as Bird in light of higher gas prices*.

244.278.    In his prepared remarks, Defendant Ling stated:

> *For the quarter, we reported revenue of $38 million, up 48% against Q1 2021 and driven by 66% year-over-year increase in rides.*
>
> *With respect to profitability, first quarter gross margin, which is net of vehicle depreciation, was 9% compared to 8% in Q1 2021. Ride profit margin before vehicle depreciation was 39% compared to 35% a year ago. Adjusted operating expenses, which excludes $49 million of stock-based compensation expense and other certain non-cash, non-recurring or non-core expenses, increased 35% year-over-year. As a percentage of revenue, adjusted operating expenses decreased 12 points versus the prior year despite increased expenses related to public company costs as well as the seasonal ramp ahead of peak operation periods.*
>
> *Adjusted EBITDA loss was $37 million compared to a loss of $30 million in the prior-year period given the softness in RpD, which Travis reviewed, as well as increased operating expenses.*

245.279.    Defendant VanderZanden returned later in the call to explain the reason for Bird's purported ride-level profitability:

> *The Fleet Manager model paved the way for Bird's consistent ride-level profitability over the past two years*, while providing a positive return to Fleet Managers and opening the door for expansion into small- to mid-sized long tail markets.

246.280.    These statements from the May 16, 2022, earnings call are false and misleading.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

(a)      All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)      All financial information that depends on revenue, including revenue growth, gross margin, and adjusted EBITDA, is false and misleading because it depends on false and misleading information as an input.

(c)      The claim that Bird's financial performance was driven by its operating model is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

N.Q.   May 18, 2022, Needham Tech & Media Conference

247.281.      On May 18, 2022, Bird presented at the Needham Tech & Media Conference. Travis VanderZanden, Bird's Founder, President, CEO, and Director, and Yibo Ling, Bird's CFO, represented Bird at the conference.

248.282.      In his prepared remarks, Defendant VanderZanden stated:

> *Last year we did $205 million of top line revenue, grew over 100% last year*. Run over 400 cities across the world, primarily US and Europe now. But, in the early days, we're focused on top line. We're very much focused on bottom line. *Now, proud that we have 49% average ride profit margins* and we just announced that we're on track to be adjusted EBITDA positive in Q3 of this year and full calendar year next year as well.

249.283.      In his prepared remarks, Defendant Ling stated:

> *But if you look at the sharing gross margin, we're now at 20%, 21% as of 2021 and those are our actuals, clearly a very, very big improvement over the time series that's shown here.*

250.284.      These statements from the May 18, 2022, investor presentation are false and misleading.

- 103 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including revenue growth, average ride profit margin, and sharing gross margin, is false and misleading because it depends on false and misleading information as an input.

**~~O.~~R.   2Q 2022 Financial Results (August 15, 2022)**

**1.    False and Misleading Financial Metrics in Form 8-K**

~~251.~~285.    Bird filed a Form 8-K on August 15, 2022, announcing its financial results for the three and six months ended June 30, 2022. It was signed by Defendant Ling. In an accompanying press release, Bird reported, among other things, quarterly Sharing Revenue of $72,395,000, total revenue of $76,662,000, a gross margin of negative $13,345,000, a net loss of $310,419,000, a net loss of $1.14 per basic and diluted common share, and adjusted EBITDA of negative $19.1 million.

~~252.~~286.    Bird also reported its financials for the six months ended June 30, 2022. Bird reported YTD 2022 Sharing Revenue of $105,972,000, total revenue of $114,640,000, deferred revenue of $37,576,000, a gross margin of negative $9,922,000, a net loss of $300,068,000, a net loss of $1.11 per basic and diluted common share, and adjusted EBITDA of negative $56.0 million.

~~253.~~287.    The preceding statements in the 8-K relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

~~(a)~~    Unbeknownst to investors, for the quarter ended June ~~30, 2022, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded~~

- 104 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)(a) Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i) Bird's 2Q 2022 Sharing Revenue was only $62,498,000 ($9,897,000 less than initially reported);

(ii)(i) Bird's 2Q 2022 total revenue was only $66,765,000 ($9,897,000 less than initially reported);

(iii)(i) Bird's 2Q 2022 gross margin was negative $23,242,000 (a $9,897,000 greater loss than initially reported);

(iv)(i) Bird's 2Q 2022 net loss was $320,316,000 (a $9,897,000 greater loss than initially reported);

(v)(i) Bird's 2Q 2022 net loss per basic and diluted common share was revised from $1.14 to $1.18 (a drop of $0.04 per share);

(a) 30, 2022, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b) Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i) Bird's 2Q 2022 Sharing Revenue was only $62,498,000 ($9,897,000 less than initially reported);

- 105 -

(ii)    Bird's 2Q 2022 total revenue was only $66,765,000 ($9,897,000 less than initially reported);

(iii)    Bird's 2Q 2022 gross margin was negative $23,242,000 (a $9,897,000 greater loss than initially reported);

(iv)    Bird's 2Q 2022 net loss was $320,316,000 (a $9,897,000 greater loss than initially reported);

(v)    Bird's 2Q 2022 net loss per basic and diluted common share was revised from $1.14 to $1.18 (a drop of $0.04 per share);

(vi)    Bird's 2Q 2022 adjusted EBITDA of negative $29.0 million ($9.9 million worse than initially reported);

(vii)(i)    Bird's YTD 2022 Sharing Revenue was only $93,471,000 ($12,501,000 less than initially reported);

(viii)(i)    Bird's YTD 2022 total revenue was only $102,139,000 ($12,501,000 less than initially reported);

(ix)(i) Bird's deferred revenue was $69,171,000 ($31,595,000 more than originally reported);

(x)(i) Bird's YTD 2022 gross margin was negative $22,423,000 (a $12,501,000 greater loss than initially reported);

(xi)(i) Bird's YTD 2022 net loss was $312,569,000 (a $12,501,000 greater loss than initially reported);

(xii)(i)    Bird's YTD 2022 net loss per basic and diluted common share was revised from $1.11 to $1.15 (a drop of $0.04 per share); and

(vii)    Bird's YTD 2022 Sharing Revenue was only $93,471,000 ($12,501,000 less than initially reported);

(viii)    Bird's YTD 2022 total revenue was only $102,139,000 ($12,501,000 less than initially reported);

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

(ix)   Bird's deferred revenue was $69,171,000 ($31,595,000 more than originally reported);

(x)   Bird's YTD 2022 gross margin was negative $22,423,000 (a $12,501,000 greater loss than initially reported);

(xi)   Bird's YTD 2022 net loss was $312,569,000 (a $12,501,000 greater loss than initially reported);

(xii)   Bird's YTD 2022 net loss per basic and diluted common share was revised from $1.11 to $1.15 (a drop of $0.04 per share); and

(xiii)   Bird's YTD 2022 adjusted EBITDA was negative $68.5 million ($12.5 million worse than initially reported).

## 2.    False and Misleading Identified Drivers for Financial Results

254.288.    In Bird's Form 8-K announcing its first quarter financials, Defendant Ling stated, "Our second quarter financial results reflect solid revenue growth along with record Sharing gross profit as the unit economics of our core Sharing business continue to benefit from efficiencies driven by our Fleet Manager operating model. The efficiencies we continue to drive through our operating model combined with our realigned fixed cost structure position us well to deliver on our path to profitability."

255.289.    In providing a comparison of its revenues for 2Q 2022 compared to the year earlier, Bird again reported its false Sharing Revenue, gross margin, and net loss figures as enumerated above. Bird stated, "***Sharing revenue increased by $15.8 million, or 27.8%, for the three months ended June 30, 2022, compared to the same period last year. The increase was primarily driven by an increase in the number of Rides (as defined below).***"

256.290.    The preceding statements are false and misleading because Sharing Revenue was less than Bird stated. Further, the claims that Bird's financial performance was driven by its unit economics, operating model efficiencies, and

- 107 -
011147-11/2321628 V1Compare Result 7 12/18/2023

fixed cost structure are false and misleading because Bird omits the material fact that $9.9 million of the $15.8 million claimed increased year-over-year quarterly Sharing Revenue (i.e., *over 62%*) is explained by Bird's false and misleading overstatement of its Sharing Revenue.

### 3.    False and Misleading Financial Metrics in Form 10-Q

257.291.    That same day, Bird filed its 2Q 2022 Form 10-Q with the SEC. The 2Q 2022 Form 10-Q reported, among other things, quarterly Sharing Revenue of $72,395,000, total revenue of $76,662,000, a gross margin of negative $13,345,000, a net loss of $310,419,000, a net loss of $1.14 per basic and diluted common share, and adjusted EBITDA of negative $19.1 million.

258.292.    The 2Q 2022 Form 10-Q also reported Bird's financials for the six months ended June 30, 2022. Bird reported YTD 2022 Sharing Revenue of $105,972,000, total revenue of $114,640,000, deferred revenue of $37,576,000, a gross margin of negative $9,922,000, a net loss of $300,068,000, a net loss of $1.11 per basic and diluted common share, and adjusted EBITDA of negative $56.0 million.

259.293.    The preceding statements in the 2Q 2022 10-Q relating to, or deriving from, Bird's Sharing Revenue were materially false and misleading and omitted to disclose material facts for the following reasons:

(c)    Unbeknownst to investors, for the quarter ended June 30, 2022, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(d)    Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(xiv)  Bird's 2Q 2022 Sharing Revenue was only $62,498,000 ($9,897,000 less than initially reported);

(xv)   Bird's 2Q 2022 total revenue was only $66,765,000 ($9,897,000 less than initially reported);

(xvi)  Bird's 2Q 2022 gross margin was negative $23,242,000 (a $9,897,000 greater loss than initially reported);

(xvii) Bird's 2Q 2022 net loss was $320,316,000 (a $9,897,000 greater loss than initially reported);

(xviii) Bird's 2Q 2022 net loss per basic and diluted common share was revised from $1.14 to $1.18 (a drop of $0.04 per share);

(a)    30, 2022, Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded.

(b)(a) Defendants' undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures as follows:

(i)    Bird's 2Q 2022 Sharing Revenue was only $62,498,000 ($9,897,000 less than initially reported);

(ii)(i) Bird's 2Q 2022 total revenue was only $66,765,000 ($9,897,000 less than initially reported);

(iii)(i) Bird's 2Q 2022 gross margin was negative $23,242,000 (a $9,897,000 greater loss than initially reported);

- 109 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(iv)(i) Bird's 2Q 2022 net loss was $320,316,000 (a $9,897,000 greater loss than initially reported);

(v)(i) Bird's 2Q 2022 net loss per basic and diluted common share was revised from $1.14 to $1.18 (a drop of $0.04 per share);

(vi)(xix)     Bird's 2Q 2022 adjusted EBITDA of negative $29.0 million ($9.9 million worse than initially reported);

(vii)(i)     Bird's YTD 2022 Sharing Revenue was only $93,471,000 ($12,501,000 less than initially reported);

(viii)(i)     Bird's YTD 2022 total revenue was only $102,139,000 ($12,501,000 less than initially reported);

(ix)(i) Bird's deferred revenue was $69,171,000 ($31,595,000 more than originally reported);

(x)(i) Bird's YTD 2022 gross margin was negative $22,423,000 (a $12,501,000 greater loss than initially reported);

(xi)(i) Bird's YTD 2022 net loss was $312,569,000 (a $12,501,000 greater loss than initially reported);

(xii)(i)     Bird's YTD 2022 net loss per basic and diluted common share was revised from $1.11 to $1.15 (a drop of $0.04 per share); and

(xx)   Bird's YTD 2022 Sharing Revenue was only $93,471,000 ($12,501,000 less than initially reported);

(xxi)  Bird's YTD 2022 total revenue was only $102,139,000 ($12,501,000 less than initially reported);

(xxii) Bird's deferred revenue was $69,171,000 ($31,595,000 more than originally reported);

(xxiii)Bird's YTD 2022 gross margin was negative $22,423,000 (a $12,501,000 greater loss than initially reported);

- 110 -

(xxiv) Bird's YTD 2022 net loss was $312,569,000 (a $12,501,000 greater loss than initially reported);

(xxv) Bird's YTD 2022 net loss per basic and diluted common share was revised from $1.11 to $1.15 (a drop of $0.04 per share); and

(xiii)(xxvi)  Bird's YTD 2022 adjusted EBITDA was negative $68.5 million ($12.5 million worse than initially reported).

### 4.    False and Misleading Statements of GAAP Compliance

260.294.    The 2Q 2022 Form 10-Q stated that Bird's balance sheet and condensed consolidated financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP')." The 2Q 2022 Form 10-Q further stated that although Bird was "continuing to assess the potential impacts of" implementing ASC 842, "it [did] not expect it to have a material effect on its consolidated financial statements."

261.295.    The 2Q 2022 Form 10-Q stated, "Our revenue is primarily generated from our Sharing business. **Customers generally pay for rides from their preloaded wallet balances on a per-ride basis, and revenue is typically recognized at the completion of the ride**."

262.296.    The preceding statements relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue.

### 5.    False and Misleading Internal Control and Sarbanes-Oxley Certifications

263.297.    Attached to the 2Q 2022 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants VanderZanden and Ling attesting to the accuracy of financial reporting, the disclosure of any material changes to Bird's internal control over financial reporting, and the disclosure of all fraud.

264.298.    In its 2Q 2022 Form 10-Q, Bird stated that it had "concluded that, as of [June 30, 2022, its] *disclosure controls and procedures were effective at a reasonable assurance level*."

265.299.    This statement was false and/or misleading. Bird omitted any mention of the material weakness in its internal control relating to its overstatement of Sharing Revenues. As Bird acknowledged in a November 18, 2022 Form 10-Q/A filed in connection with Bird's restatement of its financial statements, there was "a material weakness in our internal control over financial reporting as of December 31, 2021 and 2020 and June 30, 2022 related to the ineffective design of controls around our business systems and the lack of a review control to detect that our business systems failed to constrain revenue that resulted in the recording of revenue for uncollectible balances following the completion of certain Rides that should not have been recorded."

**6.    False and Misleading Statements on August 15, 2022, Q2 2022 Earnings Conference Call**

266.300.    Bird held a conference call on the same day that it released its 2Q 2022 Form 10-Q to discuss its earnings. In his prepared remarks, Defendant VanderZanden stated:

> *For the first half of 2022, we delivered record rides and revenues representing increases of 39% and 34%, respectively, off of a strong rebound in both metrics in the first half of 2021, while ride profit margin before vehicle depreciation reached 48%, up from 45% a year ago.*
>
> *Over the past two years, we've experienced dramatic shifts in consumer behavior patterns and despite so, our first half 2022 Sharing business revenues have nearly doubled compared to the first half of 2019, representing a compounded annual growth rate of 26%, while Sharing gross margin has turned from a loss of 159% to a positive 22%, a significant win for our core business with anticipated upside ahead.*

267.301.    In his prepared remarks, Defendant Shane Torchiana stated:

- 112 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*For the second quarter, we are pleased to deliver year-over-year Sharing revenue growth of 28%, especially on the back of 487% growth in the comparable period last year, driven by the US and other countries emerging from COVID-19 lockdowns following the rollout of vaccinations last spring.*

\* \* \*

*The ride profit margin, before vehicle depreciation, increased to 53% compared to 49% in Q2 last year. This improvement was largely driven by further optimization of Fleet Manager revenue share on the back of operational efficiencies mentioned previously. Ride profit margin after vehicle depreciation was 28%, up from 27% a year ago.*

268.302.   In his prepared remarks, Defendant Ling stated:

*With that said and turning our attention back to our second quarter financial results, for the quarter, we reported revenue of $77 million, up 28% against Q2 2021 and driven by a 29% year-over-year increase in rides. Previously mentioned, second quarter ride profit margin before vehicle depreciation of our Sharing business was 53% compared to 49% a year ago, driven by further progress in Fleet Manager rev share.*

*Gross margin, which came in at negative 17% against positive 26% in the year-ago period, was impacted by a onetime $32 million impairment charge to Product Sales. Putting aside the onetime charge and double-clicking on just the core Sharing business, gross margin as a percentage of revenue was 27% compared to 28% in Q2 2021, due primarily to outsized accelerated depreciation in the quarter.*

\* \* \*

*All in all, adjusted EBITDA loss was $19 million compared to a loss of $12 million in the prior year period.*

269.303.   These statements from the August 15, 2022, earnings call are false and misleading.

- 113 -

(a)     All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)     All financial information that depends on revenue, including revenue growth, ride profit margin, gross margin, and adjusted EBITDA, is false and misleading because it depends on false and misleading information as an input.

(c)     The claim that Bird's financial performance was driven by its operational efficiencies, emergence from COVID-19 lockdowns, optimization of Fleet Manager revenue share, and outsized accelerated depreciation is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

P.S.    September 9, 2022, Industry Conference

270.304.    On September 9, 2022, Bird presented at the Cowen Global Transportation & Sustainable Mobility Conference. Shane Torchiana, who had replaced the defenestrated Defendant VanderZanden as Bird's CEO, and Yibo Ling, Bird's CFO, represented Bird at the conference.

271.305.    In response to a question from the moderator regarding Bird's footprint at the time compared to a year earlier, Mr. Torchiana stated:

> So we do continue to expand globally. ***If you look at the Q2 quarter versus a year prior, it was up about 28% in revenue terms.***

272.306.    In response to a question from the moderator regarding unit economics on a pro-rated basis, Mr. Torchiana stated:

> Now between 2019 and 2021, as a result of just improving vehicles, we've gone through progressive generations. Bird Zero was our first self-designed vehicle, we're now in Bird Three and over half the fleet is Bird Threes. We've also seen us going from this in-house operating model to a fleet manager operating model that we just talked about there. And so between 2019 and 2021, you really see a pretty

- 114 -

striking before and after picture. *If you think about the share in gross margin then, that went from negative minus 90% in 2019 to a positive 21%.* That's a share in gross margin again in 2021. *So from minus, I need a positive 21%. That's a largely a result of those two factors that I talked about.*

*Now, if you just actually focus in on the labor part of it and exclude vehicle depreciation, that went from minus 9.4% in 2019 to positive 46% in 2021. So today, we're very much in the 20s in terms of that sharing business gross margin and we feel very, very good about significant upside on that as we think about the future for the same reasons that we've already – for the same sort of tailwinds that we've already experienced.*

273.307.    These statements from the September 9, 2022, investor presentation are false and misleading.

(a)    All claimed revenue figures are false and misleading because, as described above, Bird overstated its Sharing Revenues to include uncollectable revenue.

(b)    All financial information that depends on revenue, including revenue growth, and sharing gross margin, is false and misleading because it depends on false and misleading information as an input.

(c)    The claim that Bird's financial performance was driven by its vehicle design and operating model is false and misleading because Bird omits the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue.

## VI.    ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

274.308.    The core operations doctrine supports a strong inference of scienter as to Defendant Ling. According to Bird's Amended Form 10-K, sharing revenue was 83.7% and 90.7% of Bird's revenue for 2020 and 2021, respectively.

- 115 -

275.309.    Further supporting the inference of Ling's scienter is the simplicity of the accounting standards that Bird violated. Bird acknowledged in its financial statements that they treated customer rentals as leases pursuant to ASC 842 (formerly ASC 840). ASC 842, in turn states that revenue from leases should be recognized as a contract according to ASC 606. ASC 606 requires a reporting entity to assess whether it is probable that the entity will collect all the consideration it will be entitled in exchange for the goods or services that it provides to the customer. Because, as Bird admitted, it simply recorded negative balances as revenue, it performed no assessment at all as to the probability of collection. Given the simplicity and obviousness of the requirement to perform such an assessment, Bird's failure to do so supports Ling's scienter.

276.310.    Further supporting the inference of Ling's scienter is the suspicious and sudden timing of his departure. On September 21, 2022, without any prior notice, Bird announced that Ling would be leaving the company effective immediately and would be replaced by an outsider to the company, Ben Lu. By November 14, 2022, Bird issued an 8-K disclosing the misstatement, and a mere four days later, on November 18, issued restated financials including corrected revenue and deferred revenue numbers. The suspicious timing and nature of Ling's departure supports an inference that Ling was terminated because his fraud was uncovered. In the alternative, if Ling was fired for unrelated reasons, it nonetheless supports an inference of scienter because it indicates that the new CFO discovered the fraud almost immediately after joining the company, which supports an inference that the fraud was obvious.

311.    Further supporting the inference of Ling's scienter is Bird's ability to continue as a going concern. As warned of in Bird's proxy statements, Bird had incurred significant operating losses in the past and may not be able to achieve or maintain profitability in the future and its longevity may depend upon obtaining

- 116 -

additional financing. Indeed, only a year after completing the Merger, Bird issued a going concern warning, indicating that without additional funding, the Company would be unable to meet its obligations over the next year. These circumstances gave Defendant Ling a motive to exaggerate Bird's revenue, financial metrics based on this figure and its financial prospects in order to complete the merger and receive the cash necessary for Bird to continue operations.

277.312.    The core operations doctrine supports a strong inference of scienter as to Defendant VanderZanden. According to Bird's Amended Form 10-K, sharing revenue was 83.7% and 90.7% of Bird's revenue for 2020 and 2021, respectively.

278.313.    Further supporting the inference of VanderZanden's scienter is the simplicity of the accounting standards that Bird violated. Bird acknowledged in its financial statements that they treated customer rentals as leases pursuant to ASC 842 (formerly ASC 840). ASC 842, in turn states that revenue from leases should be recognized as a contract according to ASC 606. ASC 606 requires a reporting entity to assess whether it is probable that the entity will collect all the consideration it will be entitled in exchange for the goods or services that it provides to the customer. Because, as Bird admitted, it simply recorded negative balances as revenue, it performed no assessment at all as to the probability of collection. Given the simplicity and obviousness of the requirement to perform such an assessment, Bird's failure to do so supports VanderZanden's scienter.

279.314.    Further supporting the inference of VanderZanden's scienter is the suspicious and sudden timing of his departure. On September 21, 2022, without any prior notice, Bird announced that VanderZanden would be stepping down as CEO effective immediately and would be replaced by the company's Shane Torchiana. By November 14, 2022, Bird issued an 8-K disclosing the misstatement, and a mere four days later, on November 18, issued restated financials including

- 117 -

corrected revenue and deferred revenue numbers. The suspicious timing and nature of VanderZanden's departure supports an inference that VanderZanden was terminated because his fraud was uncovered. In the alternative, if VanderZanden was fired for unrelated reasons, it nonetheless supports an inference of scienter because it indicates that the new CFO discovered the fraud almost immediately after joining the company, which supports an inference that the fraud was obvious.

315.    Further supporting the inference of VanderZanden's scienter is Bird's ability to continue as a going concern. As warned of in Bird's proxy statements, Bird had incurred significant operating losses in the past and may not be able to achieve or maintain profitability in the future and its longevity may depend upon obtaining additional financing. Indeed, only a year after completing the Merger, Bird issued a going concern warning, indicating that without additional funding, the Company would be unable to meet its obligations over the next year. These circumstances gave Defendant VanderZanden a motive to exaggerate Bird's revenue, financial metrics based on this figure and its financial prospects in order to complete the merger and receive the cash necessary for Bird to continue operations.

280. 316.    Further supporting Defendant Mutrie's scienter is the extensive due diligence that Mutrie oversaw prior to the acquisition of Bird, as described in ¶¶ 71-73 83-89, *supra*.

281. 317.    Mutrie's scienter is further evident from the shockingly large profits he stood to make after the SPAC Merger, given his massive amounts of Bird stock.

282. 318.    As part of the Business Combination, Switchback's sponsor, NGP Switchback II, LLC, of which Mutrie and McNeill were co-CEOs, paid $25,000 for 7,906,250 "Founders Shares," 80,000 of which were subsequently transferred to the independent directors of Switchback. As of October 5, 2021, those shares were worth $9.95 per share, a more than 3000-fold increase in the value of the

- 118 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147.11/2321628 V1 Compare Result 7 12/18/2023

shares. Those shares constituted a 20% interest in Switchback that would convert into Class A of the target company shares if a qualifying business combination were approved. As of October 5, 2021, the Founder Shares were valued at $78,667,187.5. If the merger was approved, those founder shares would convert to common shares of Bird. However, if the merger was not approved, and Switchback could not find another merger target before January 2023, Switchback would be required to dissolve and return the remaining funds for redemption to the public shareholders of Switchback. However, Mutrie, as a holder of founder shares, would receive no part of that distribution. Therefore, he had an extraordinary financial incentive ensure that the merger was consummated.

283.319.    Further supporting McNeill's scienter is the extensive due diligence that McNeill oversaw prior to the acquisition of Bird, as described in ¶¶ 71-73 83-89, *supra*.

284.320.    McNeill's scienter is further evident from the shockingly large profits he stood to make after the SPAC Merger, given his massive amounts of Bird stock.

285.321.    As part of the Business Combination, Switchback's sponsor, NGP Switchback II, LLC, of which Mutrie and McNeill were co-CEOs, paid $25,000 for 7,906,250 "Founders Shares," 80,000 of which were subsequently transferred to the independent directors of Switchback. As of October 5, 2021, those shares were worth $9.95 per share, a more than 3000-fold increase in the value of the shares. Those shares constituted a 20% interest in Switchback that would convert into Class A of the target company shares if a qualifying business combination were approved. As of October 5, 2021, the Founder Shares were valued at $78,667,187.50 million. If the merger was approved, those founder shares would convert to common shares of Bird. However, if the merger was not approved, and Switchback could not find another merger target before January 2023, Switchback

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

would be required to dissolve and return the remaining funds for redemption to the public shareholders of Switchback. However, McNeill, as a holder of founder shares, would receive no part of that distribution. Therefore, he had an extraordinary financial incentive ensure that the merger was consummated.

286.322.    Finally, that each of the Individual Defendants held themselves out in their public statements as personally familiar with the Company's financial performance, including Bird's Sharing Revenues, further supports scienter as to each Individual Defendant. Indeed, in connection with publicly announcing the proposed business combination, Defendants Mutrie and McNeill identified Bird's "compelling current revenues" as one of the reasons the Company satisfied their investment criteria and shareholders should vote in favor of the merger. In addition, in connection with the merger and throughout the Class Period, including in press releases, SEC filings and on earnings calls, Defendants VanderZanden and Ling regularly spoke to investors and securities analysts regarding, among other topics, the Company's Sharing Revenue, the drivers for the revenue, and that Bird's financial statements were presented "in accordance with United States generally accepted accounting principles ("GAAP")." Having spoken on these subjects so many times, the Individual Defendants knew, or were deliberately reckless in not knowing, that the statements about Bird's revenues were false and misleading and omitted material information.

## VII.  LOSS CAUSATION

287.323.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

288.324.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and/or engaged in a course of conduct that artificially inflated the price of Bird's securities and deceived purchasers of Bird's

- 120 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

securities. By failing to disclose the true state of Bird's financial performance, business and operations, Defendants presented a misleading picture of Bird's condition and value, which had the intended effect and caused Bird's securities to trade at artificially inflated prices during the Class Period. Investors purchased Bird's securities based on these false premises. Bird stock could not have been issued, or would have been sold at dramatically lower prices, had investors been aware of Bird's true state of affairs.

289.325.    Because Plaintiffs were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose material information regarding Bird's true revenues and the actual drivers for these revenues), Plaintiffs paid an artificially inflated and unreasonable price for their purchases of Bird stock.

**A.    Corrective Disclosures**

290.326.    As set forth herein, as Defendants' materially false, misleading, and incomplete statements, and their fraudulent scheme were partially revealed through disclosure events occurring on September 21, 2022, and November 14-18, 2022, the price of Bird's securities immediately and materially fell, as the prior inflation came out of the Company's stock price.

291.327.    The immediate and material decline in the price of Bird's stock was a direct result of the nature and extent of Defendants' deception (or results of its deception) being revealed to investors and the market. The timing and magnitude of Bird's stock price declines negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' misconduct.

292.328.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these

- 121 -

matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Bird securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Bird securities and that the corrective disclosure of the Defendants' misrepresentations and omissions would cause the price of Bird securities to decline.

**B.    Materialization of the Risk**

293.329.    As detailed herein, Defendants engaged in a scheme and/or course of conduct to deceive Plaintiffs, which artificially inflated the price of Bird stock and operated as a fraud or deceit on Plaintiffs and Class members by failing to disclose and misrepresenting the adverse facts detailed herein.

294.330.    Bird's financial results and future business prospects were based upon false and misleading statements and omissions regarding its purported revenues, financial metrics dependent upon reported revenues, and the drivers for these financial metrics.

295.331.    Throughout the period during which Plaintiffs and Class members purchased Bird stock, the prices of these securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

296.332.    Defendants' false statements served to conceal the risks that their misconduct would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, earnings calls, and industry conferences.

297.333.    It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including: (i) key executive departures, including the termination of its Founder and Chief Executive

- 122 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

Officer and Chief Financial Officer; (ii)- the announcement of non-reliance of the Company's reported financial results for 2020 and 2021, along with the first two quarters of 2022; (iii)- the inability to timely file quarterly results for Q3 2022; (iv)- the withdrawal of fiscal year 2022 guidance; (vi)- analyst downgrades or discontinuance of coverage; (vi)- the restatement of the Company's reported financial results for 2020 and 2021, along with the first two quarters of 2022; and (vii)- the disclosure of material weaknesses in the Company's internal disclosure controls and processes. The materialization of any one or more of these factors would lead to a significant decline in the price of Bird's stock.

298.334.    The value of Plaintiffs' investments in Bird stock was negatively impacted when the concealed risks noted above materialized.

299.335.    The declines in the price of the Bird stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

300.336.    Had Plaintiffs known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the Bird stock at artificially inflated prices.

301.337.    As a result of their purchases of the Bird stock, Plaintiffs suffered economic loss and damages, as contemplated by the federal securities laws.

## VIII.  NO SAFE HARBOR

302.338.    Neither the federal statutory safe harbor applicable to forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine do not apply to statements included in financial statements prepared in accordance with generally accepted accounting

011147 11/2321628 V1Compare Result 7 12/18/2023

principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

303.339.    To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were insufficient to insulate Defendants from liability for their materially false and misleading statements.

304.340.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Bird who knew that the statement was materially false or misleading when made.

## IX.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

305.341.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of (a) all those who purchased or otherwise acquired the publicly traded securitiescommon stock of Bird during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures., as well as (b) all persons and entities other than Defendants who held shares, of Switchback common stock on August 16, 2021 and were eligible to vote on the approval of the merger between Switchback

- 124 -

and Bird Rides, Inc. at Switchback's extraordinary general meeting on or about November 2, 2021, based on the proxy statement issued in connection with the Merger. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

306.342.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bird securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

307.343.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

308.344.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

309.345.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws wereExchange Act was violated by Defendants' acts Defendants as alleged herein;

- 125 -

- whether statements made ~~by Defendants to~~ in the ~~investing public during the Class Period~~Proxy misrepresented material facts about the ~~financial condition,~~ business, operations, and ~~management of the Company; whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;~~

- ~~whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;~~

- ~~whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;~~

(b)    ~~whether the prices~~prospects of Bird ~~securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein~~; and

(c)    ~~whether~~to what extent the members of the Class have sustained damages and~~, if so, what is~~ the proper measure of damages.

~~310.~~346.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

~~311.~~347.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
~~011147 11/2321628 V1~~Compare Result 7 12/18/2023

- the omissions and misrepresentations were material;
- Bird securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on NYSE, and was covered by four analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased and/or sold Bird securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

312.348.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

313.349.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    FRAUD CLAIMS

### COUNT I

**VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS BIRD, VANDERZANDEN, LING, MUTRIE AND MCNEILL**

314.350.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

315.351.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

316.352.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

317.353.    The Company and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes, and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Bird securities during the Class Period.

318.354.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's

- 128 -

allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

319.355.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

320.356.    As a result of the foregoing, the market price of Bird securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Bird securities during the Class Period in purchasing Bird securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

321.357.    Had Plaintiffs and the other members of the Class been aware that the market price of Bird securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Bird securities at the artificially inflated prices that they did, or at all.

322.358.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

- 129 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

323.359.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Bird securities during the Class Period.

324.360.    This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

## COUNT II

### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS VANDERZANDEN, LING, MUTRIE AND MCNEILL

325.361.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

326.362.    During the Class Period, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

327.363.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

328.364.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the

- 130 -

Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bird securities.

329.365.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

330.366.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

331.367.    This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

## XI.    PROXY CLAIMS

368.    Plaintiffs' Proxy Claims do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, or intentional conduct as part of their Proxy Claims. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Proxy Claim, which do not have scienter, fraudulent intent or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to

- 131 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
011147 11/2321628 V1Compare Result 7 12/18/2023

the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

369.    As alleged herein at ¶¶ 164, 172, 174, 177, 183-185, 187, 193-194, 204-206, 210-211, 213-214 and 216, Bird and the Proxy Defendants made a series of materially untrue statements and omissions of material facts in the Merger Proxy and Solicitation Materials. Those statements were misleading for the reasons stated in ¶¶ 165, 173, 175, 178, 186, 188, 195, 207, 212, 215, and 217. Each of the Proxy Defendants participated in the preparation, review and dissemination of the materially misleading Proxy complained of herein. The Proxy Defendants abdicated their duty to file and distribute to Plaintiffs and the Class a Proxy that was not misleading. Accordingly, the Proxy Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

370.    As a direct result of the Proxy Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiffs and the Class were precluded from exercising their right to seek redemption of their shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The false and misleading Proxy used to obtain shareholder approval of the acquisition deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Switchback shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, the Proxy Defendants were aware of and/or had access to the true facts concerning Bird's actual financial performance, which was far below the financial performance represented to shareholders. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy that the Proxy Defendants used to obtain shareholder approval of and thereby consummate the Business Combination,

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

371. The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

372. The Proxy's untrue statements of material fact included, among other things, that: (i) Bird had improperly recognized Sharing Revenue. Specifically, for certain customers with insufficient preloaded "wallet" balances, Bird's business systems recorded revenue for uncollected balances following the completion of certain Rides that should not have been recorded; (ii) Bird's undisclosed improper recognition of Sharing Revenue resulted in a material overstatement of Sharing Revenue, understatement of deferred revenue in the consolidated balance sheets, and misstatement of metrics dependent upon these figures; (iii) Bird's consolidated financial statements relating to compliance with GAAP were false and misleading and omitted to disclose material facts because Bird violated GAAP and did not account for Sharing Revenue according to ASC 840 when it failed to account for the collectability of its Sharing Revenue; (iv) the statements about the drivers for Bird's financial performance were false and misleading because they omitted the material fact that the claimed increase in Sharing Revenue, and thus total revenue and other related financial measures, was driven in part by Bird's false and misleading statement of its Sharing Revenue; and (v) Bird had material weaknesses in its internal controls over financial reporting.

373. The extent of Bird's problems was revealed in a series of disclosures as alleged above, on September 21, 2022 and November 14-18, 2022, which caused the

- 133 -

price of Bird's securities to decline well below the share price on November 2, 2021, the date of the shareholder vote on the Merger.

## COUNT III

## VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS

374.   Plaintiffs incorporate by reference and reallege ¶¶ 163-165, 170-178, 182-188, 192-195, 203-207 as though fully set forth herein. This Count does not sound in fraud. Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct, including all allegations contained in Part VI. above (Lead Plaintiff's additional allegations of scienter). This claim is based solely on negligence.

375.   SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

376.   To avoid all doubt, this Rule also extends to solicitations made before furnishing a proxy statement that are made pursuant to and in compliance with the conditions of SEC Rule 14a-12, 17 C.F.R. § 240.14a–12.

377.   As stated herein, Defendants prepared, reviewed, and/or disseminated false and misleading Proxy Statements and other Soliciting Materials (collectively, "Soliciting Materials") which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These Soliciting Materials were essential links in the consummation

- 134 -

of Bird's November 2, 2021 SPAC Merger. These Soliciting Materials include those identified in Part V, *supra* ¶¶ 163-165, 170-178, 182-188, 192-195, 203-207.

378. Pre-Merger Switchback (now Defendant Bird) acted negligently in issuing and disseminating the Soliciting Materials because these materials contained the false and misleading statements alleged herein. Prior to the completion of the SPAC Merger, Switchback, through the Switchback Individual Defendants, filed each and every of the above-alleged SEC filings regarding Bird's financial performance and drivers for such performance. Switchback acted through the Switchback Individual Defendants, and the Switchback Individual Defendants' negligence is imputable to Switchback.

379. Defendants Mutrie, McNeill, and the Switchback Director Defendants acted negligently by issuing, disseminating, and/or signing the Soliciting Materials because they contained the false and misleading statements alleged herein.

(a) During the Class Period, up through the Merger, Defendant Mutrie was the Co-Chief Executive Officer and Director of Switchback, and owed shareholders a fiduciary duty by way of these roles, including avoiding issuing, disseminating, and/or signing statements in Proxy and Solicitation materials that contained materially false and misleading statements. The Soliciting Materials also identified Mutrie as a director on Bird's pro-forma post-SPAC Merger Board. Prior to the SPAC Merger, Mutrie signed the Proxy Statement and made statements in Soliciting Materials for the SPAC Merger filed with the SEC. Following the SPAC Merger, Mutrie did in fact serve as a Director of Bird's Board.

(b) During the Class Period, up through the SPAC Merger, Defendant McNeill was the Co-Chief Executive Officer and Director of Switchback, and owed shareholders a fiduciary duty by way of these roles, including avoiding issuing, disseminating, and/or signing statements in Proxy and Solicitation materials that contained materially false and misleading statements. Prior to the SPAC Merger,

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147-11/2321628 V1Compare Result 7 12/18/2023

McNeill made false and misleading statements in Soliciting Materials made pursuant to Rule 14a-12 of the Exchange Act, including press releases.

(c)    During the Class Period, up through the SPAC Merger, the Switchback Director Defendants made or were responsible for the dissemination of the misstatements and omissions in the Proxy, which was published in the name of the DCRB Board. The Proxy was solicited "on behalf of the Board of Directors," and issued "by order of the Board of Directors." The Switchback Board unanimously recommended that Switchback shareholders vote in favor of the proposed Merger. Moreover, the Switchback Defendants permitted the use of their names by, among other things, allowing the Proxy Statement to represent that they recommended the Merger.

380.    Defendants Mutrie, McNeill, and the Switchback Director Defendants acted negligently by unreasonably making and/or disseminating the false and misleading statements alleged, given that there was not sufficient information capable of confirming the accuracy of those false and misleading statements. In fact, readily available information that would be apparent from a reasonably diligent investigation into Bird demonstrates the inaccuracy of these Defendants' statements, including the truth about Bird's revenue recognition practices, compliance with GAAP and its stated revenue recognition practice, reported revenues and metrics dependent upon those figures, and the drivers for such revenue that Bird claimed in the Proxy and Solicitation Materials and thereafter.

381.    Pre-Merger Bird (now Defendant Bird) acted negligently in issuing and/or disseminating the Soliciting Materials because they contained the false and misleading statements alleged herein. Defendant Bird acted through Defendants VanderZanden and Ling, and it was negligent to the same extent as VanderZanden and Ling.

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

382.   Defendants VanderZanden and Ling acted negligently in making and/or disseminating the statements contained within the Soliciting Materials, insofar as they "made" and/or had ultimate control over statements by permitting false and misleading statements to appear next to their name(s) and image. Additionally, these Defendants acted negligently allowing the Soliciting Materials to be disseminated with such misleading statements to appear next to their name(s) and image(s):

(a)     During the Class Period, up through the Merger, VanderZanden was the founder and Chief Executive Officer of Bird, and the Chief Executive Officer and a director of Bird Holdings since its formation. After the Merger, VanderZanden was the President, Chief Executive Officer ("CEO") and a Director of Bird up until September 21, 2022. In those roles, VanderZanden directly oversaw Bird's business model, operations and financial condition, often serving as the Company's face in investor communications and media appearances.

(b)     During the Class Period, up through the Merger, Ling was the Chief Financial Officer of Bird, and the Chief Financial Officer of Bird Holdings since its formation. After the Merger, Ling served as Bird's Chief Financial Officer up until September 21, 2022. In that role, Ling directly oversaw the Company's accounting, financial reporting, planning, and analysis functions, and also appeared alongside Defendant VanderZanden, Mutrie and McNeill in public conversations with investors. This includes June 24, 2021, Research Analyst Day, during which Ling falsely reported on Bird's historical financial performance.

383.   Defendants VanderZanden and Ling acted negligently, given that there was not sufficient information capable of confirming the accuracy of the false and misleading statements they made, disseminated, or allowed to be disseminated next to their name(s) and image(s). In fact, readily available information that would be apparent from their positions, or a reasonably diligent investigation into Bird, demonstrates the inaccuracy of these Defendants' statements, including the truth

- 137 -

about Bird's revenue recognition practices, compliance with GAAP and its stated revenue recognition practice, reported revenues and metrics dependent upon those figures, and the drivers for such revenue that Bird claimed in the Proxy and Solicitation Materials and thereafter.

384.    The written communications made, issued, and/or disseminated by the Defendants constitute violations of Rule 14a-9 and § 14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner

385.    As a direct result of the defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiffs and the Class were precluded from exercising their right to seek redemption of their Switchback securities prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The false and misleading Proxy used to obtain shareholder approval of the Merger deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Switchback shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning Bird's actual financial performance, which was far below the financial performance as represented to shareholders in the Proxy. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

386.    The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

387.   By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT IV

### VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST DEFENDANTS TRAVIS VANDERZANDEN, YIBO LING, JIM MUTRIE, SCOTT MCNEILL, CHRIS CARTER, SCOTT GIESELMAN, SAM STOUTNER, PHILIP J. DEUTCH, RAY KUBIS, AND PRECIOUS WILLIAMS OWODUNNI ARISING FROM PRIMARY VIOLATIONS OF SECTION 14(A)

388.   Plaintiffs repeat and reallege the allegations in ¶¶ 163-165, 170-178, 182-188, 192-195, 203-207 as if set forth fully herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely in negligence

389.   As alleged above, Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged in this Complaint.

390.   Each of the Proxy Defendants, VanderZanden, Ling, Mutrie, McNeill, Chris Carter, Scott Gieselman, Sam Stoutner, Philip J. Deutch, Ray Kubis, and Precious Williams Owodunni, acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their ownership interest, high level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, control over material operational data and/or intimate knowledge of the Company's actual performance, and their power to control the Proxy, the Proxy Defendants had the power and ability to control the information contained in the Proxy. Indeed, the Proxy Defendants provided the operational information contained in the Proxy and were

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

unjustly enriched from the Merger. By reason of such conduct, the Proxy Defendants are liable pursuant to Section 20(a) of the Exchange Act.

391. Specifically, the Proxy Defendants, by virtue of their high-level positions as officers and/or directors of Switchback and/or Bird, as detailed herein, participated in the operation and management of Switchback and/or Bird, and conducted and participated, directly and indirectly, in the conduct of the business affairs Switchback and/or Bird, and therefore exercised general control over the operations of Switchback and/or Bird. The Proxy Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of Switchback and/or Bird, including the identification of target companies to be acquired by Switchback, the evaluation of Bird, and the content and dissemination of the Proxy and Solicitation Materials, which Plaintiffs contend was false and misleading.

392. Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

393. This claim is brought within the applicable statute of limitations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the members of the Class by reason of the acts and transactions alleged herein;

- 140 -

C.    Awarding Plaintiffs and the members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: ~~August 15,~~December __, 2023          Respectfully submitted,

/s/ Lucas E. Gilmore
Lucas E. Gilmore (250893)
Reed R. Kathrein (139304)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite ~~202~~300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

Nathan Emmons (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
nathane@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff David Boulware*

- 141 -
[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
**THE ROSEN LAW FIRM, P.A.**
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com

Jonathan Stern (*pro hac vice* forthcoming)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jstern@rosenlegal.com

*Counsel for Additional Plaintiff
Lawrence Lou*

- 142 -

[PROPOSED] SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

011147 11/2321628 V1Compare Result 7 12/18/2023

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAW

I, Christos Givas, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.  I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  My transaction(s) in Bird Global, Inc. f/k/a Switchback II Corporation, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5.  Within the last three years, I have not sought to serve or served as a class representative in any federal securities fraud case except in this Action.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _15_ day of December, 2023.

DocuSigned by:

*Christos Givas*

4ABC9F332F814A8...

Christos Givas